

## ARCH INSURANCE COMPANY

(A Missouri Corporation)

Home Office Address:

2345 Grand Blvd, Suite 900
Kansas City, MO 64108

Administrative Address:

311 South Wacker Drive
Suite 3700
Chicago, IL 60606
Tel: (214) 438-4011

## ARCH CORPORATE CANOPY® POLICY
## PRIVATE COMPANY MANAGEMENT LIABILITY & CRIME INSURANCE

**EXCEPT AS OTHERWISE PROVIDED, THE LIABILITY COVERAGE PARTS OF THIS POLICY APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED TO THE INSURER NO LATER THAN SIXTY (60) DAYS AFTER THE END OF THE POLICY PERIOD. EACH APPLICABLE LIABILITY COVERAGE PART LIMIT OF LIABILITY SHALL BE REDUCED BY DEFENSE COSTS PAYMENTS.**

## DECLARATIONS

**Policy No.:**   PCD 9300378-02

**Item 1.**   **Named Organization & Address:**   MID-WEST CONVEYOR CO.
8245 NIEMAN ROAD
LENEXA, KS 66214

**Item 2.**   **Policy Period:**
From:          December 17, 2015
To:            December 17, 2016
12:01 a.m. local time at the address stated in Item 1

**Item 3.**   **Policy Premium:**                                                      $27,381.00
Taxes, Surcharges and other Assessments, if applicable:              $0.00
Premium attributable to Terrorism Risk Insurance:                   $0.00
Included In Policy Premium                    ☒
In Addition To Policy Premium                 ☐

**Item 4.**   **Extended Reporting Period (Liability Coverage Parts only):**
Additional Period:          12 month(s)
Additional Premium:       125.00 %

**Item 5.**     **Notices to Insurer:**

<u>Claims or Potential Claims:</u>

Arch Insurance Company
Executive Assurance Claims
1299 Farnam Street, Suite 500
Omaha, NE  68102
P.O. Box 542033
Omaha, NE  68154
Phone:  877 688-ARCH (2724)
Fax:  866 266-3630
E-mail:  Claims@ArchInsurance.com

<u>All Other Notices:</u>

Arch Insurance Company
Executive Assurance Underwriting
One Liberty Plaza, 53rd Floor
New York, NY  10006
Fax: (212) 651-6499

**Item 6.**     **Coverage Elections:**

**Only those Coverage Parts, Insuring Agreements, and Options designated with an X are included under this Policy.**

☐     **Liability Coverage Parts Aggregate Limit of Liability Option:**

☒     **Directors, Officers, & Organization Liability Coverage Part:**

| Limit of Liability | Deductible Each Claim | Pending and Prior Litigation Date | Options |
|---|---|---|---|
| $5,000,000 | Insuring Agreement A: nil | Insuring Agreement A: 11/07/2007 | ☒ Additional $500,000 Limit of Liability for Claims against Insured Persons |
|  | Insuring Agreement B: $25,000 | Insuring Agreement B: 11/07/2007 |  |
|  | Insuring Agreement C: $25,000 | Insuring Agreement C: 11/07/2007 |  |

05 PCD0071 00 03 10

[X] **Employment Practices Liability Coverage Part:**

| Limit of Liability | Deductible Each Claim | Pending and Prior Litigation Date | Options |
|---|---|---|---|
| $1,000,000 | $25,000 | 11/07/2007 | [X] Third Party Coverage: <br>– Sublimit of Liability: $1,000,000 <br>– Deductible: $25,000 <br>– Pending and Prior Litigation Date: 11/07/2007 |

[X] **Fiduciary Liability Coverage Part:**

| Limit of Liability | Deductible Each Claim | Pending and Prior Litigation Date |
|---|---|---|
| $1,000,000 | $0 | 11/07/2007 |

[X]   **Crime Coverage Part:**

| Insuring Agreement | Limit of Liability | Deductible | Options |
|---|---|---|---|
| [X]  A.  Employee Theft | $1,000,000 | $25,000 | [ ]  Loss Sustained or [X]  Loss Discovered (If neither box above is designated with an X, this Policy shall be issued on a Loss Sustained basis) |
| [X]  B.  Customer Property | $1,000,000 | $25,000 | |
| [X]  C.  Inside the Premises | $1,000,000 | $25,000 | |
| [X]  D.  Outside the Premises | $1,000,000 | $25,000 | |
| [X]  E.  Forgery or Alteration | $1,000,000 | $25,000 | |
| [X]  F.  Computer Fraud or Fraudulent Transfer Instructions | $1,000,000 | $25,000 | [X]  Investigation Costs Coverage: – Sublimit of Liability: $100,000 |
| [X]  G.  Currency Fraud | $1,000,000 | $25,000 | |

**Item 7.   Endorsements:** See attached schedule of endorsements and notices.

This Policy shall not be valid unless signed by a duly authorized representative of the Insurer.

_Candace Spooner_
_____
Authorized Representative

December 15, 2015
_____
Date



Signature Page

IN WITNESS WHEREOF, Arch Insurance Company has caused this policy to be executed and attested.

_____
John Mentz
President

_____
Patrick Nails
Secretary

05 ML0002 00 12 14

Page 1 of 1

# SCHEDULE OF FORMS AND ENDORSEMENTS

| INSURED: MID-WEST CONVEYOR CO. | TERM: December 17, 2015 | to December 17, 2016 |
|---|---|---|
| POLICY NUMBER: PCD 9300378-02 | | |

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| | 05 PCD0071 00 03 10 | ARCH CORPORATE CANOPY POLICY PRIVATE COMPANY MANAGEMENT LIABILITY & CRIME INSURANCE DECLARATIONS |
| | 05 ML0002 00 12 14 | SIGNATURE PAGE (ARCH INSURANCE) |
| | 00 PCD0072 00 04 07 | GENERAL PROVISIONS COVERAGE FORM TABLE OF CONTENTS |
| | 00 PCD0073 00 04 07 | DIRECTORS, OFFICERS, & ORGANIZATIONLIABILITY COVERAGE PART |
| | 00 PCD0074 00 04 07 | EMPLOYMENT PRACTICES LIABILITYCOVERAGE PART |
| | 00 PCD0075 00 04 07 | FIDUCIARY LIABILITYCOVERAGE PART |
| | 00 PCD0076 00 04 07 | CRIME COVERAGE PART |
| 1 | 00 PCD0216 00 09 09 | KIDNAP, RANSOM & EXTORTION COVERAGE PART |
| 2 | 00 PCD0328 00 11 10 | AMENDMENTS TO GENERAL PROVISIONS |
| 3 | 00 ML0207 00 11 03 | STATE AMENDATORY INCONSISTENCY (GENERAL PROVISIONS) |
| 4 | 00 PCD0198 00 09 09 | INSURED RIGHT TO CONSENT TO SETTLEMENTS (GENERAL PROVISIONS) |
| 5 | 00 PCD0206 00 02 10 | OTHER INSURANCE - FUND POLICY (GENERAL PROVISIONS) |
| 6 | 00 PCD0204 00 09 09 | INSURED DUTY TO DEFEND -- OPTION TO TENDER DEFENSE (GENERAL PROVISIONS) |
| 7 | 00 ML0207 00 11 03 | NAMED CO-DEFENDANTS EXTENSION FOR PRIVATE EQUITY AND VENTURE CAPITAL FIRMS (GENERAL PROVISIONS) |
| 8 | 00 PCD0396 00 05 12 | AMEND COVERAGE PART COORDINATION PROVISION |
| 9 | 00 PCD0325 00 11 10 | AMENDMENTS TO DIRECTORS, OFFICERS, & ORGANIZATION LIABILITY COVERAGE PART |
| 10 | 00 PCD0227 00 11 11 | OUTSIDE CAPACITY EXCLUSION - PRIVATE EQUITY CLARIFICATION (D&O) |
| 11 | 00 PCD0189 00 09 09 | ANTITRUST EXCLUSION - DEFENSE COSTS SUBLIMIT (D&O COVERAGE PART) |

| ENDT. NO. | FORM NO. | TITLE |
|---|---|---|
| 12 | 00 PCD0266 00 04 10 | CRISIS MANAGEMENT EXPENSES FOR NETWORK SECURITY BREACH (D&O LIABILITY COVERAGE PART) |
| 13 | 00 PCD0272 00 06 10 | ADDITIONAL LIMIT OF LIABILITY - $1,000,000 (SAME CLAIM) (D&O LIABILITY COVERAGE PART) |
| 14 | 00 PCD0385 00 10 11 | ARCH CANOPY PREMIERSM WITH CONTINUITY PROTECTION EMPLOYMENT PRACTICES LIABILITY COVERAGE PART |
| 15 | 00 PCD0262 00 03 10 | WORKPLACE VIOLENCE COVERAGE (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART) |
| 16 | 00 PCD0265 00 04 10 | EMPLOYEE PRIVACY VIOLATION - DEFENSE COSTS SUB-LIMIT (EPL COVERAGE PART) |
| 17 | 00 PCD0367 00 04 11 | AMEND WAGE & HOUR EXCLUSION (EPL COVERAGE PART) |
| 18 | 00 PCD0327 00 11 10 | AMENDMENTS TO FIDUCIARY LIABILITY COVERAGE PART |
| 19 | 00 PCD0232 00 11 09 | AMEND DEFINITION OF LOSS - HIPAA SUBLIMIT (FIDUCIARY COVERAGE PART) |
| 20 | 00 PCD0180 00 07 09 | CROWN CANOPY CRIME COVERAGE PART |
| 21 | 00 PCD0473 00 08 13 | AMEND DEFINITIONS OF DATA AND LOSS (CRIME COVERAGE PART) |
| 22 | 00 PCD0474 00 08 13 | AMEND OWNERSHIP OF PROPERTY; INTERESTS COVERED SECTION (CRIME COVERAGE PART) |
| 23 | 00 PCD0431 00 10 12 | PRIOR ACTS EXCLUSION |
| 24 | 00 PCD0215 00 10 14 | ADDITIONAL INSURED ORGANIZATIONS WITH PRIOR ACT DATE (GENERAL PROVISIONS) |
| 25 | 00 ML0207 00 11 03 | PAYMENT INSTRUCTION FRAUD COVERAGE (CRIME COVERAGE PART) |
| 26 | 00 ML0207 00 11 03 | SPECIFIC ENTITY EXCLUSION |
| 27 | 00 PCD0077 17 05 07 | KANSAS AMENDATORY ENDORSEMENT (CANOPY) |
|  | 00 MLT0027 00 01 15 | TERRORISM COVERAGE DISCLOSURE NOTICE |
|  | 00 ML0065 00 06 07 | U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") |

## GENERAL PROVISIONS

## TABLE OF CONTENTS

1.    APPLICABILITY OF GENERAL PROVISIONS

2.    DEFINITIONS

3.    COVERAGE TERRITORY

4.    COVERAGE EXTENSIONS

5.    EXTENDED REPORTING PERIOD

6.    LIMIT OF LIABILITY

7.    DEDUCTIBLE

8.    DEFENSE OF CLAIMS

9.    CLAIM AND POTENTIAL CLAIM NOTICES

10.   INTERRELATED CLAIMS

11.   ALLOCATION

12.   SUBROGATION

13.   OTHER INSURANCE

14.   CORPORATE TRANSACTIONS

15.   APPLICATION

16.   SUITS AGAINST THE INSURER

17.   ENTIRE AGREEMENT

18.   CHANGES

19.   ASSIGNMENT

20.   NAMED ORGANIZATION'S AUTHORITY

21.   CANCELLATION

22.   BANKRUPTCY

23.   NOTICES

24.   TITLES

25.   REFERENCES TO LAWS

26.   COVERAGE PART COORDINATION

In consideration of the payment of the premium and in reliance upon the **Application**, the Insurer specified in the Declarations (the "**Insurer**") and the **Insureds** agree as follows:

# GENERAL PROVISIONS

1. **APPLICABILITY OF GENERAL PROVISIONS**

   **A.** Except as specifically provided herein, the General Provisions apply to all Coverage Parts.

   **B.** Except as specifically provided therein, the provisions of each Coverage Part apply to such Coverage Part only.

   **C.** If there is a conflict between the General Provisions and any Coverage Part, the provisions of the Coverage Part shall control.

2. **DEFINITIONS**

   Whether used in the singular or plural, the following terms shall have the meanings specified below:

   **A.** "**Application**" means the application for this Policy, including any information and materials submitted therewith or incorporated therein. "**Application**" also means any application, including any information and materials submitted therewith or incorporated therein, for any insurance policy in an uninterrupted series of policies issued by the **Insurer**, or any insurance company controlling, controlled by or under common control with the **Insurer**, of which this Policy is a direct or indirect renewal or replacement. The **Application** shall be deemed attached to and is incorporated into this Policy.

   **B.** "**Claim**" shall have the meaning specified in the respective **Liability Coverage Part**.

   **C.** "**Debtor in Possession**" means a "debtor in possession" as defined in Chapter 11 of the United States Bankruptcy Code or any similar law.

   **D.** "**Defense Costs**" means reasonable and necessary fees and expenses incurred in the defense or appeal of a **Claim**. **Defense Costs** shall include the premium for any appeal, attachment or similar bond, provided that the **Insurer** shall have no obligation to issue such bond. **Defense Costs** shall not include any compensation, benefit expenses, or overhead of any **Insureds**.

   **E.** "**Domestic Partner**" means any natural person qualifying as a domestic partner under any federal, state or local law or under the provisions of any formal program established by any **Insured Organization**.

   **F.** "**Employee**" shall have the meaning specified in the respective Coverage Part.

   **G.** "**ERISA**" means the Employee Retirement Income Security Act of 1974, the English Pension Scheme Act 1993, the English Pensions Act 1995, or any similar law.

   **H.** "**Executive**" shall have the meaning specified in the respective Coverage Part.

   **I.** "**Independent Contractor**" means any natural person working for an **Insured Organization** in the capacity of an independent contractor pursuant to an express contract or agreement with an **Insured Organization** governing the nature of such person's engagement.

**J.**     "**Insolvency**" means the status of any **Insured Organization** due to:

    **1.**     the appointment of any conservator, liquidator, receiver, trustee, or similar official to control, supervise, or liquidate such **Insured Organization**; or

    **2.**     such **Insured Organization** becoming a **Debtor in Possession**.

**K.**     "**Insured Organization**" means:

    **1.**     the **Named Organization**; or

    **2.**     any **Subsidiary**;

including any such organization as a **Debtor in Possession**.

**L.**     "**Insured Person**" shall have the meaning specified in the respective Coverage Part.

**M.**     "**Insureds**" shall have the meaning specified in the respective Coverage Part.

**N.**     "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

**O.**     "**Liability Coverage Part**" means any Coverage Part of this Policy other than the Crime Coverage Part.

**P.**     "**Loss**" shall have the meaning specified in the respective Coverage Part.

**Q.**     "**Named Organization**" means the organization named in Item 1 of the Declarations.

**R.**     "**Non-Indemnifiable Loss**" means any **Loss** incurred by **Insured Persons** that all **Insured Organizations** cannot indemnify because of:

    **1.**     legal prohibition; or

    **2.**     **Insolvency**.

In determining **Non-Indemnifiable Loss**, all **Insured Organizations** shall be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted or required by law.

**S.**     "**Policy Period**" means the period specified in Item 2 of the Declarations, subject to any cancellation prior to the scheduled expiration date.

**T.**     "**Pollutants**" means any solid, liquid, gaseous, biological, radiological or thermal contaminant or irritant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals, mold, fungi, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos containing products, waste or any electric, magnetic, or electromagnetic field of any frequency. "Waste" includes, without limitation, material to be recycled, reconditioned, or reclaimed.

**U.**     "**Subsidiary**" means any:

    **1.**     corporation in which, and for as long as, the **Named Organization** owns or controls, either directly or indirectly, more than 50% of the outstanding

securities representing a present right to vote for the election of the board of directors of such corporation;

2.    limited liability company in which, and for as long as, the **Named Organization** owns or controls, either directly or indirectly, the right to elect, appoint or designate more than 50% of the members of the board of managers or management committee of such limited liability company;

3.    joint venture corporation or limited liability company in which, and for as long as, the **Named Organization**: (i) owns or controls, either directly or indirectly, exactly 50% of the outstanding securities representing a present right to vote for the election of the board of directors of such corporation or the right to elect, appoint or designate exactly 50% of the members of the board of managers or management committee of such limited liability company; and (ii) solely controls the management and operations of such organization pursuant to a written agreement with the other owners of such organization; or

4.    foundation, charitable trust, or political action committee in which, and for as long as, the **Named Organization** exclusively sponsors such entity or organization.

V.    "**Wrongful Act**" shall have the meaning specified in the respective **Liability Coverage Part**.

## 3.    COVERAGE TERRITORY

This Policy shall apply on a worldwide basis.

## 4.    COVERAGE EXTENSIONS

Regarding the **Liability Coverage Parts** only:

### A.    Spousal Coverage

Coverage shall apply to a **Claim** made against the lawful spouse or **Domestic Partner** of any **Insured Person** provided that:

1.    such **Claim** arises solely out of:

    a.    such person's status as the spouse or **Domestic Partner** of an **Insured Person**; or

    b.    such person's ownership of property sought as recovery for a **Wrongful Act**;

2.    the **Insured Person** is named in such **Claim** along with the spouse or **Domestic Partner**; and

3.    no coverage shall apply to any **Claim** for a **Wrongful Act** of such spouse or **Domestic Partner**.

Coverage for such **Claim** shall be on the same terms and conditions (including, without limitation, the Deductible) as apply to a **Claim** made against an **Insured Person**.

**B.**   **Estate Coverage**

If any **Insured Person** dies, becomes incapacitated, or files for bankruptcy, any **Claim** made against such person's estate, heirs, assigns or legal representatives for a **Wrongful Act** of such **Insured Person** shall be deemed a **Claim** made against such **Insured Person**. No coverage shall apply to any **Claim** for a **Wrongful Act** of such estate, heirs, assigns or legal representatives.

**5.**   **EXTENDED REPORTING PERIOD**

Regarding the **Liability Coverage Parts** only:

**A.**   If the **Insurer** or **Named Organization** shall refuse to renew this Policy, or if the **Named Organization** shall cancel this Policy, the **Insureds** shall have the right, upon payment of the Additional Premium stated in Item 4 of the Declarations, to a continuation of the coverage afforded by all elected **Liability Coverage Parts** for the Additional Period stated in Item 4 of the Declarations (the "Extended Reporting Period"). If elected, the Extended Reporting Period shall commence upon the effective date of such nonrenewal or cancellation. Such continuation of coverage shall apply only to a **Claim**:

   **1.**   first made against the **Insureds** during the Extended Reporting Period for a **Wrongful Act** occurring prior to the end of the **Policy Period**; and

   **2.**   otherwise covered by any **Liability Coverage Part**.

**B.**   The rights contained in this section shall terminate unless a written notice of election together with the additional premium due is received by the **Insurer** within thirty (30) days after the effective date of nonrenewal or cancellation.

**C.**   The additional premium for the Extended Reporting Period shall be fully earned at the inception of the Extended Reporting Period. The Extended Reporting Period is not cancelable.

**D.**   There is no separate limit of liability for the Extended Reporting Period.

**6.**   **LIMIT OF LIABILITY**

Regarding the **Liability Coverage Parts** only:

**A.**   The Limit of Liability specified in Item 6 of the Declarations for each **Liability Coverage Part** shall be the maximum aggregate amount that the **Insurer** shall pay under such **Liability Coverage Part**.

**B.**   Notwithstanding the above, if the Liability Coverage Parts Aggregate Limit of Liability Option is elected in Item 6 of the Declarations:

   **1.**   such single shared Limit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under all **Liability Coverage Parts** combined; and

   **2.**   any amount specified as a Limit of Liability for an elected **Liability Coverage Part** shall be:

      **a.**   the maximum aggregate amount that the **Insurer** shall pay under such **Liability Coverage Part**; and

       **b.**    part of, and not in addition to, the amount specified as the Liability Coverage Parts Aggregate Limit of Liability.

**C.**    **Defense Costs** shall be part of, and not in addition to, each applicable Limit of Liability. Payment of **Defense Costs** by the **Insurer** shall reduce each applicable Limit of Liability.

**7.**    **DEDUCTIBLE**

Regarding the **Liability Coverage Parts** only:

**A.**    The **Insurer** shall pay covered **Loss** arising from each **Claim** covered under any **Liability Coverage Part** only to the extent such **Loss** is in excess of the applicable Deductible specified in Item 6 of the Declarations.

**B.**    Each Deductible under any **Liability Coverage Part** shall be uninsured.

**C.**    Any **Loss** paid by the **Insurer** under any **Liability Coverage Part** pursuant to a duty to defend or otherwise that is within any applicable Deductible shall be reimbursed by any **Insured Organization** upon the **Insurer's** request.

**D.**    If a **Claim** is subject to multiple Deductibles, then each Deductible shall apply separately to such **Claim**, provided that the total Deductible for such **Claim** shall not exceed the highest applicable Deductible.

**E.**    No Deductible shall apply to **Non-Indemnifiable Loss**.

**F.**    If any **Insured Organization** is permitted by common or statutory law to indemnify an **Insured Person** for **Loss**, or to advance **Defense Costs** on their behalf, and fails to do so other than because of **Insolvency**, then any coverage under a **Liability Coverage Part** for such **Insured Person** shall apply without any Deductible. In such case, the **Insured Organization** shall reimburse the **Insurer** for the Deductible that would have applied if indemnification or advancement had been made.

**8.**    **DEFENSE OF CLAIMS**

Regarding the **Liability Coverage Parts** only:

**A.**    The **Insurer** shall have the right and duty to defend each **Claim** covered under a **Liability Coverage Part** for which the **Insurer** receives notice, even if such **Claim** is groundless, false or fraudulent. The **Insurer** may make any investigation it deems appropriate.

**B.**    The **Insurer's** duty to defend any **Claim** shall end upon exhaustion of any applicable Limit of Liability. If any applicable Limit of Liability is exhausted, the premium for this Policy shall be fully earned.

**C.**    The **Insureds** shall neither admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any admission, assumption, settlement, stipulation, or **Defense Costs** to which it has not consented.

**D.**    The **Insurer** may, with the written consent of the **Insureds**, settle any **Claim** for a monetary amount that the **Insurer** deems reasonable. If any **Insureds** refuse to

consent to the settlement of a **Claim** recommended by the **Insurer** and acceptable to a claimant, then the **Insurer** shall not pay **Loss** for such **Claim** in excess of the sum of:

    **1.**    The amount of the proposed settlement plus **Defense Costs** incurred prior to such refusal; and

    **2.**    80% of **Loss** incurred for such **Claim** in excess of the amount specified in 1. above.

**E.**    The **Insureds** shall give to the **Insurer** all information and cooperation as the **Insurer** may reasonably request. Upon the **Insurer's** request, the **Insureds** shall attend proceedings, hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting the defense of any **Claim**.

**9.**    **CLAIM AND POTENTIAL CLAIM NOTICES**

Regarding the **Liability Coverage Parts** only:

**A.**    As a condition precedent to coverage, the **Insureds** shall give the **Insurer** written notice of any **Claim** as soon as practicable, but no later than 60 days after the end of the **Policy Period** or the Extended Reporting Period, if applicable. Such notice shall specify the **Liability Coverage Part** under which notice is being given.

**B.**    If, during the **Policy Period** or Extended Reporting Period, if applicable, the **Insureds** become aware of a **Wrongful Act** that may reasonably be expected to give rise to a **Claim** against an **Insured** for which coverage may be available under a **Liability Coverage Part**, and if written notice of such **Wrongful Act** is given to the **Insurer** during the **Policy Period** or Extended Reporting Period**,** if applicable, specifying the (i) reasons for anticipating such a **Claim**, (ii) nature and date of the **Wrongful Act**, (iii) identity of the **Insureds** involved, (iv) injuries or damages sustained, (v) names of potential claimants, (vi) manner in which the **Insureds** first became aware of the **Wrongful Act** and (vii) the **Liability Coverage Part** under which such notice is being given, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made at the time that the **Insurer** receives such notice.

**10.**    **INTERRELATED CLAIMS**

Regarding the **Liability Coverage Parts** only, all **Claims** arising from, based upon, or attributable to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

**A.**    any of such **Claims** was first made, even if such date is before the **Policy Period;**

**B.**    proper notice of such **Wrongful Act** or **Interrelated Wrongful Act** was given to the **Insurer** pursuant to Section 9.B above; or

**C.**    notice of such **Wrongful Act** or **Interrelated Wrongful Act** was given under any prior insurance policy.

**11.**    **ALLOCATION**

Regarding the **Liability Coverage Parts** only, if the **Insureds** incur **Loss** that is only partially covered by this Policy because a **Claim** includes both covered and uncovered

matters or because a **Claim** is made against both covered and uncovered parties, **Loss** shall be allocated as follows:

**A.** 100% of **Defense Costs** shall be allocated to covered **Loss**; and

**B.** **Loss** other than **Defense Costs** shall be allocated between covered and non-covered **Loss** based upon the relative legal exposure of the parties to such matters.

## 12. SUBROGATION

The **Insurer** shall be subrogated to all of the **Insureds**' rights of recovery regarding any payment of **Loss** under this Policy. The **Insureds** shall do everything necessary to secure and preserve such rights, including, without limitation, the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of the **Insureds**. The **Insureds** shall do nothing to prejudice the **Insurer's** position or any rights of recovery.

## 13. OTHER INSURANCE

Coverage under this Policy shall apply only in excess of any other valid and collectible insurance or bond regardless of whether such other insurance or bond is stated to be excess, contributory, contingent or otherwise, unless such other insurance or bond is written specifically excess of this Policy by reference in such other insurance or bond to this Policy's Policy Number.

## 14. CORPORATE TRANSACTIONS

### A. Takeover of Named Organization

If, during the **Policy Period**:

**1.** any person or entity or group of persons and/or entities acting in concert acquires securities which result in ownership by such person(s) and/or entity(ies) of more than 50% of the outstanding securities representing the present right to vote for the election of directors or equivalent positions of the **Named Organization**; or

**2.** the **Named Organization** merges into or consolidates with another organization such that the **Named Organization** is not the surviving organization,

then coverage shall continue under this Policy, but only for **Claims** for **Wrongful Acts** (under a **Liability Coverage Part**) or covered **Loss** (under the Crime Coverage Part) occurring before such transaction. No coverage shall be available for any **Wrongful Act** (under a **Liability Coverage Part**) or **Loss** (under the Crime Coverage Part) occurring after such transaction. Upon such transaction, the entire premium for this Policy shall be deemed fully earned. The **Insureds** shall give the **Insurer** written notice of such transaction as soon as practicable, but not later than 90 days after the effective date of such transaction.

### B. Acquisition or Creation of Subsidiary

If, before or during the **Policy Period**, any **Insured Organization**:

**1.** creates or acquires a **Subsidiary**; or

2. merges with another organization such that the **Insured Organization** is the surviving entity,

then such newly created, acquired or merged organization and its **Insureds** shall be covered under this Policy for **Wrongful Acts** (under a **Liability Coverage Part**) or covered **Loss** (under the Crime Coverage Part) occurring after such acquisition, merger or creation. No coverage shall be available for any: (i) **Wrongful Act** (under a **Liability Coverage Part**) or **Loss** (under the Crime Coverage Part) of any new **Insureds** occurring before such transaction; or (ii) any **Interrelated Wrongful Acts** thereto.

If the fair value of the assets of any newly acquired or merged organization exceeds 25% of the total consolidated assets of the **Named Organization** as reflected in its most recent consolidated audited financial statements prior to such merger or acquisition, then as a condition precedent to coverage for such new **Insureds**, the **Named Organization** shall give the **Insurer** written notice of the transaction as soon as practicable, pay any reasonable additional premium, and be subject  to any additional terms and conditions required by the **Insurer**. The **Insureds** shall furnish all information regarding such transaction as the **Insurer** shall request.

**C.**   **Loss of Subsidiary Status**

If, before or during the **Policy Period**, any organization ceases to be a **Subsidiary**, then coverage shall be available under this Policy for such **Subsidiary** and its **Insureds**, but only for **Claims** for covered **Wrongful Acts** (under a **Liability Coverage Part**) or covered **Loss** (under the Crime Coverage Part) occurring before such transaction. No coverage shall be available to such **Insureds** for any **Wrongful Act** (under a **Liability Coverage Part**) or covered **Loss** (under the Crime Coverage Part) occurring after such transaction.

**15.**   **APPLICATION**

**A.**   The **Insureds** represent that the information contained in the **Application** is true, accurate and complete. This Policy is issued in reliance upon the **Application**. If the **Application** contains misrepresentations or omissions made with intent to deceive or that materially affect the acceptance of the risk or the hazard assumed by the **Insurer**, this Policy shall be void ab initio and shall not afford coverage for any **Insureds** who knew on the inception date of this Policy the facts that were not truthfully disclosed in the **Application**, whether or not the **Insureds** knew the **Application** contained such misrepresentation or omission.

**B.**   For the purpose of determining coverage, knowledge possessed by:

1. any **Insured Person** shall not be imputed to any other **Insured Person**; and

2. the **Named Organization's** chairman of the board, chief executive officer, president, chief operating officer, chief financial officer, limited liability company manager, or anyone signing the **Application** shall be imputed to all **Insureds** other than **Insured Persons**.

**16.**   **SUITS AGAINST THE INSURER**

**A.**   No suit or other proceeding shall be commenced by the **Insureds** against the **Insurer** unless there shall have been full compliance with all the terms and conditions of this Policy.

**B.**   No person or organization shall have any right under this Policy to join the **Insurer**

as a party to any **Claim** against the **Insureds** nor shall the **Insurer** be impleaded by the **Insureds** in any **Claim**.

**17.   ENTIRE AGREEMENT**

This Policy, including the Declarations, General Provisions, elected Coverage Part(s), written endorsements, and the **Application** shall constitute the entire agreement between the **Insurer** and the **Insureds** regarding the insurance provided hereunder.

**18.   CHANGES**

This Policy shall not be changed in any manner except by a written endorsement issued by the **Insurer**.

**19.   ASSIGNMENT**

Assignment of any interest under this Policy shall not bind the **Insurer** unless such assignment is acknowledged by a written endorsement issued by the **Insurer**.

**20.   NAMED ORGANIZATION'S AUTHORITY**

The **Named Organization** shall act on behalf of all **Insureds** regarding all matters under this Policy, including, without limitation, cancellation, election of the Extended Reporting Period, transmission and receipt of notices, reporting of **Claims** and potential **Claims**, acceptance of endorsements, payment of premiums, and receipt of return premiums.

**21.   CANCELLATION**

**A.**   The **Insurer** may cancel this Policy for non-payment of premium by sending not less than 20 days notice to the **Named Organization**. This Policy may not otherwise be cancelled by the **Insurer**.

**B.**   Except as otherwise provided, the **Named Organization** may cancel this Policy by sending written notice of cancellation to the **Insurer**. Such notice shall be effective upon receipt by the **Insurer** unless a later cancellation date is specified therein.

**C.**   If the **Insurer** cancels this Policy, unearned premium shall be calculated on a pro rata basis. If the **Insureds** cancel this Policy, unearned premium shall be calculated at the **Insurer's** customary short rates. Payment of any unearned premium shall not be a condition precedent to the effectiveness of a cancellation. The **Insurer** shall make payment of any unearned premium as soon as practicable.

**22.   BANKRUPTCY**

Bankruptcy or insolvency of any **Insureds** shall not relieve the **Insurer** of any of its obligations under this Policy.

**23.   NOTICES**

**A.**   Notices to the **Insureds** shall be sent to the **Named Organization** at the address specified in Item 1 of the Declarations.

**B.**   Notices to the **Insurer** shall be sent to the applicable address specified in Item 5 of the Declarations and become effective upon receipt at such address.

**C.**   All notices shall be in writing.

**24.    TITLES**

The titles of the sections of, and endorsements to, this Policy are for reference only.  Such titles shall not be part of the terms and conditions of coverage.

**25.    REFERENCES TO LAWS**

**A.**    Any statute, act, or code mentioned in this Policy shall be deemed to include all amendments of, and rules and regulations promulgated under, such statute, act, or code.

**B.**    Any statute, act, or code mentioned in this Policy that is followed by the phrase "or any similar law" shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, any common law.

**26.    COVERAGE PART COORDINATION**

Regarding the **Liability Coverage Parts** only:

**A.**    If any **Loss** is covered under the Employment Practices Liability Coverage Part and any other **Liability Coverage Part**:

**1.**    the **Insurer** shall first pay such **Loss** under the Employment Practices Liability Coverage Part prior to paying such **Loss** under any other **Liability Coverage Part**; and

**2.**    the **Insureds** shall be entitled to recover **Loss** only once.

**B.**    Regardless of the **Liability Coverage Part** under which a notice of claim or potential claim is given by the **Insureds**, the **Insurer** shall be entitled to make its own determination as to which **Liability Coverage Part**, if any, **Loss** is covered and should be paid.

# DIRECTORS, OFFICERS, & ORGANIZATION
# LIABILITY COVERAGE PART

## TABLE OF CONTENTS

1. INSURING AGREEMENTS

2. DEFINITIONS

3. OUTSIDE DIRECTORSHIP LIABILITY COVERAGE

4. EXCLUSIONS

5. PRIORITY OF NON-INDEMNIFIABLE LOSS PAYMENTS

6. ADDITIONAL LIMIT OF LIABILITY

7. PUBLIC OFFERING OF SECURITIES

# DIRECTORS, OFFICERS, & ORGANIZATION
# LIABILITY COVERAGE PART

1.   **INSURING AGREEMENTS**

A.   **Insured Person Liability**

The **Insurer** shall pay **Non-Indemnifiable Loss** on behalf of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**.

B.   **Organization Reimbursement**

The **Insurer** shall pay **Loss** on behalf of an **Insured Organization** that such **Insured Organization** has, to the extent permitted or required by law, indemnified the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**.

C.   **Organization Liability**

The **Insurer** shall pay **Loss** on behalf of an **Insured Organization** resulting from a **Claim** first made against such **Insured Organization** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by an **Insured Organization**.

D.   **Derivative Demands**

The **Insurer** shall pay **Investigation Costs** on behalf of an **Insured Organization** resulting from a **Derivative Demand** first made during the **Policy Period** or Extended Reporting Period, if applicable.

This Insuring Agreement shall be subject to a Sublimit of Liability of $250,000. Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under this Insuring Agreement. Such Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**. No Deductible shall apply to this Insuring Agreement.

2.   **DEFINITIONS**

Whether used in the singular or plural, the following terms shall have the meanings specified below:

A.   **"Claim"** means any:

1.   written demand for monetary or non-monetary relief commenced by the **Insured's** receipt of such demand;

2.   civil proceeding commenced by the service upon the **Insured** of a complaint or similar pleading;

3.   criminal proceeding commenced by the return of an indictment, information or similar pleading;

4.   formal administrative or regulatory proceeding of an **Insured Person** commenced by the filing of a notice of charges or any similar document;

5.   formal administrative or regulatory investigation of an **Insured Person** commenced by the service upon or other receipt by such **Insured Person** of a written notice from an investigating authority specifically identifying such **Insured Person** as a target against whom a formal proceeding may be commenced;

6.   written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim** as described above, commenced by the **Insured's** receipt of such request; or

7.   solely for purposes of Insuring Agreement D, any **Derivative Demand**.

B.   **"Derivative Demand"** means a written demand by any security holder of an **Insured Organization**, in their capacity as such, upon the board of directors or managers of such **Insured Organization** to bring a civil proceeding on behalf of an **Insured Organization** against an **Insured Person** for a **Wrongful Act** of such **Insured Person** if such demand is made without the assistance, participation or solicitation of any **Executive**.  A **Derivative Demand** shall be deemed commenced by the receipt by the board of directors or managers of such demand.

C.   **"Derivative Suit"** means any civil proceeding against an **Insured Person** for a **Wrongful Act** of such **Insured Person** made on behalf of, or in the name or the right of, an **Insured Organization** by any security holders of such **Insured Organization**, in their capacity as such, if such proceeding is made without the assistance, participation or solicitation of any **Executive**.

D.   **"Employee"** means any natural person whose labor or service was, is or shall be engaged and directed by any **Insured Organization**, including fulltime, part-time, seasonal, leased and temporary employees as well as volunteers.   **Employee** shall not include any **Independent Contractor**.

E.   **"Executive"** means any natural person who was, is or shall be a duly elected or appointed:

1.   director, officer, or member of the board of the managers or management committee of an **Insured Organization**;

2.   in-house general counsel of an **Insured Organization**; or

3.   manager of an **Insured Organization** organized outside the United States of America if such position is equivalent to those specified in 1 or 2 above.

F.   **"Insured Person"** means any:

1.   **Executive**; or

2.   **Employee**.

G.   **"Insureds"** means any:

1.   **Insured Organization**; or

2.   **Insured Person**.

H.   **"Investigation Costs"** means reasonable and necessary expenses incurred in the investigation and evaluation of a **Derivative Demand**, provided that **Investigation Costs** shall not include compensation, benefit expenses, or overhead of any **Insureds**.

I. **"Loss"** means the amount that the **Insureds** are legally obligated to pay resulting from a **Claim**, including, without limitation, damages, settlements, judgments, pre- and post-judgment interest, **Defense Costs**, and **Investigation Costs**.

**Loss** shall include punitive and exemplary damages where insurable by law.   The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall exclude any:

1.   taxes, fines or penalties imposed by law;

2.   multiple portion of any multiplied damage award;

3.   matters that are uninsurable under the law pursuant to which this Policy shall be construed;

4.   amount for which the **Insureds** are not financially liable or for which the claimants are without legal recourse to the **Insureds**; or

5.   non-monetary relief.

J. **"Outside Capacity"** means service by an **Insured Person** as a director, officer, trustee, regent, governor or equivalent executive of an **Outside Organization** with the knowledge and consent, or at the request, of an **Insured Organization**.

K. **"Outside Organization"** means any:

1.   not-for-profit corporation, community chest, fund or foundation that is not an **Insured Organization** and that is exempt from federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986;

2.   organization established for a religious or charitable purpose under any not-for-profit statute; or

3.   organization listed as an **Outside Organization** in a written endorsement issued by the **Insurer**.

L. **"Wrongful Act"** means any actual or alleged:

1.   act, error, omission, misstatement, misleading statement, neglect or breach of duty by **Insured Persons** in their capacity as such or in an **Outside Capacity** or, with respect to Insuring Agreement C, by any **Insured Organization**; or

2.   matter claimed against an **Insured Person** solely by reason of their serving in such capacity, including service in an **Outside Capacity**.

## 3.   OUTSIDE DIRECTORSHIP LIABILITY COVERAGE

Subject to the provisions applicable to this **Liability Coverage Part**, coverage is afforded for **Loss** from any **Claim** against an **Insured Person** for a **Wrongful Act** in an **Outside Capacity**.   Such coverage shall be specifically excess of any indemnity and insurance available from or provided by the **Outside Organization**.   Payment by the **Insurer**, or any insurance company controlling, controlled by or under common control with the **Insurer**, under any other insurance policy as a result of such **Claim** shall reduce, by the amount of such payment, the Limit of Liability available under this Policy for such **Claim**.

**4.   EXCLUSIONS**

**A.**   The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured**:

**1.**   arising from, based upon, or attributable to any fact, circumstance or situation that, before the inception date of this Policy, was the subject of any notice given under any other insurance policy;

**2.**   arising from, based upon, or attributable to any:

   **a.**   demand, suit or proceeding made or initiated against any **Insured** on or prior to the applicable Pending and Prior Litigation Date in Item 6 of the Declarations; or

   **b.**   **Wrongful Act** specified in such prior demand, suit or proceeding or any **Interrelated Wrongful Acts** thereto;

**3.**   for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

**4.**   arising from, based upon, or attributable to any:

   **a.**   discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release, escape, seepage, migration or disposal; or

   **b.**   direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste,

   provided that this exclusion shall not apply to any **Non-Indemnifiable Loss** or any **Derivative Demand** otherwise covered under Insuring Agreement D;

**5.**   for any violation of **ERISA** or any similar law;

**6.**   by or on behalf of any **Insured**, provided that this exclusion shall not apply to any **Claim**:

   **a.**   that is a **Derivative Demand** or **Derivative Suit**;

   **b.**   by an **Insured Person** for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

   **c.**   by any **Employee** who is not a past or present **Executive** if such **Claim** is made without the assistance, participation or solicitation of any **Executive**;

   **d.**   by an **Executive** for wrongful employment termination, employment discrimination or other employment practices **Wrongful Acts**;

   **e.**   by a former **Executive** who has not served as an **Executive** for at least four years prior to such **Claim** being made, provided that such **Claim** is made without the assistance, participation or solicitation of any current **Executive** or any former **Executive** who has served as an **Executive** during the four years prior to such **Claim** being made;

**f.**     by any trustee appointed to administer the estate of any **Insured Organization** under the United States Bankruptcy Code or any similar law; or

**g.**     made in a jurisdiction outside the United States of America, Canada or Australia by an **Insured Person** of an **Insured Organization** organized in such jurisdiction;

**7.**     arising from, based upon, or attributable to any **Insured Person** serving as a director, officer, trustee, regent, governor or equivalent executive or as an employee of any entity other than an **Insured Organization** even if such service is at the direction or request of the **Insured Organization**, provided that this exclusion shall not apply to a **Claim** for a **Wrongful Act** by an **Insured Person** in an **Outside Capacity**;

**8.**     by or on behalf of any **Outside Organization**, or any director, officer, trustee, regent, governor or equivalent executive of any **Outside Organization**, provided that this exclusion shall not apply to any **Claim**:

**a.**     that is a derivative suit made on behalf of an **Outside Organization** by any persons who are not:

**1.**     **Insured Persons**; or

**2.**     directors, officers, trustees, regents, governors or equivalent executives     of the **Outside Organization**,

and who make such **Claim** without the solicitation, assistance or participation of any such persons; or

**b.**     by any:

**1.**     **Insured Persons**; or

**2.**     directors, officers, trustees, regents, governors or equivalent executives     of an **Outside Organization**,

for contribution or indemnification if such **Claim** directly results from a **Claim** that is otherwise covered under this **Liability Coverage Part**;

**9.**     arising from, based upon, or attributable to any public offering of securities of an **Insured Organization** or the purchase or sale of such securities subsequent to such public offering; provided that this exclusion shall not apply to any **Claim**:

**a.**     for a **Wrongful Act** in an offering of securities of an **Insured Organization** to any accredited investor in a transaction that is exempt from registration under the Securities Act of 1933 ("accredited investor" shall have the meaning specified for such term in Rule 501 of Regulation D of the General Rules and Regulations promulgated under the Securities Act of 1933); or

**b.**     made by any security holders of an **Insured Organization** for the failure of the **Insured Organization** to undertake or complete an initial public offering of securities of such **Insured Organization**;

**10.**     arising from, based upon, or attributable to the gaining, in fact, of any personal profit, remuneration or advantage to which such **Insured** is not legally entitled; or

11. arising from, based upon, or attributable to any deliberately fraudulent or criminal act or omission or any willful violation of law by such **Insured** if a judgment or other final adjudication in such **Claim** or another proceeding establishes that such act, omission or violation occurred.

Regarding exclusions 10 and 11 above: (i) no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**; and (ii) only a **Wrongful Act** by a past, present or future chairman of the board, chief executive officer, president, chief operating officer, chief financial officer or limited liability company manager of any **Insured Organization** shall be imputed to an **Insured Organization**.

B. The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured Organization**:

1. arising from, based upon, or attributable to any liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement;

2. arising from, based upon, or attributable to any wrongful employment termination, employment discrimination, or other employment practices **Wrongful Act**;

3. arising from, based upon, or attributable to the rendering of, or failure to render, any professional services for others, including, without limitation, services performed by the **Insureds** for or on behalf of a customer or client;

4. arising from, based upon, or attributable to defamation, invasion of privacy, wrongful entry or eviction, false arrest or imprisonment, malicious prosecution, abuse of process, assault, battery or loss of consortium;

5. arising from, based upon, or attributable to infringement of any intellectual property rights, including, without limitation, copyrights, patents, trademarks, trade names, trade dress, service marks, or trade secrets;

6. arising from, based upon, or attributable to price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, Sherman Anti-Trust Act, Clayton Act, or any similar law regulating anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities;

7. arising from, based upon, or attributable to discrimination or sexual harassment; or

8. arising from, based upon, or attributable to the payment by an **Insured Organization** of inadequate consideration in connection with an **Insured Organization's** purchase of securities issued by any **Insured Organization**; provided that this exclusion shall not apply to **Defense Costs**.

## 5.   PRIORITY OF NON-INDEMNIFIABLE LOSS PAYMENTS

A. If **Loss** is incurred that is acknowledged by the **Insurer** to be covered under this **Liability Coverage Part** except that such **Loss** exceeds the remaining Limit of Liability for this **Liability Coverage Part**, the **Insurer** shall pay that portion of such **Loss** constituting **Non-Indemnifiable Loss** covered under Insuring Agreement A before paying **Loss** covered under any other Insuring Agreements.

B. If **Loss** is incurred that is acknowledged by the **Insurer** to be covered under any Insuring Agreement of this **Liability Coverage Part** other than Insuring Agreement A, the **Named Organization** shall have the right to direct the **Insurer** to delay payment of such **Loss** until

such time as the **Named Organization** specifies.   Any such direction by the **Named Organization** to delay or make payment of **Loss** shall be by written notice to the **Insurer**. The **Insurer's** liability under this Policy shall not be increased, and the **Insurer** shall not be liable for any interest, as a result of any such delayed **Loss** payment.   Any such delayed payment of **Loss** shall be available to the **Insurer** to pay **Non-Indemnifiable Loss** covered under Insuring Agreement A.   Any **Non-Indemnifiable Loss** payment by the **Insurer** under Insuring Agreement A out of funds withheld pursuant to this provision shall terminate the **Insurer's** liability to make a delayed payment of **Loss** under any other Insuring Agreement by the amount of such **Non-Indemnifiable Loss** payment.

**6.   ADDITIONAL LIMIT OF LIABILITY**

**A.**   If an Additional $500,000 Limit of Liability for Claims against Insured Persons("Additional Limit of Liability") is elected in Item 6 the Declarations, then an additional limit of liability of $500,000 shall be available to pay **Non-Indemnifiable Loss** covered under Insuring Agreement A.

**B.**   Any Additional Limit of Liability shall be in addition to, and not part of, the Limit of Liability otherwise applicable to this **Liability Coverage Part** as specified in Item 6 of the Declarations.

**C.**   Any Additional Limit of Liability shall be excess of any valid and collectible insurance that is specifically excess of this Policy.   Such excess insurance must be exhausted by the payment of loss covered thereunder before the **Insurer** shall be liable to pay the Additional Limit of Liability.

**D.**   **Non-Indemnifiable Loss** covered under Insuring Agreement A shall be allocated between, and paid by the **Insurer** under, the applicable Limit of Liability specified in Item 6 of the Declarations and any Additional Limit of Liability in whatever portions will maximize the total amount of covered **Loss** being paid under this Policy.

**7.   PUBLIC OFFERING OF SECURITIES**

If a public offering of an **Insured Organization's** securities occurs during the **Policy Period** that is not exempt from registration under the Securities Act of 1933, the **Insurer** shall furnish the **Insureds** with a quote for directors and officers liability insurance coverage of such offering, provided that:

**A.**   at least 30 days prior to the effective date of such offering, the **Insureds** shall give the **Insurer** written notice of such offering together with all information requested by the **Insurer**; and

**B.**   such quote shall be on such terms and conditions, including any additional premium, as the **Insurer**, in its sole discretion, chooses.

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE PART

## TABLE OF CONTENTS

1.    INSURING AGREEMENTS

2.    DEFINITIONS

3.    EXCLUSIONS

4.    OTHER INSURANCE

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE PART

**1.    INSURING AGREEMENTS**

   **A.    Employment Practices Liability**

   The **Insurer** shall pay **Loss** on behalf of the **Insureds** resulting from a **Claim** by or on behalf of an **Employee**, applicant for employment, governmental agency, or **Independent Contractor** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds**.

   **B.    Third Party Liability**

   If Third Party Liability coverage is elected in Item 6 of the Declarations, the **Insurer** shall pay **Loss** on behalf of the **Insureds** resulting from a **Claim** by or on behalf of a **Third Party** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds**.

   This Insuring Agreement shall be subject to the Third Party Coverage Sublimit of Liability, Deductible, and Pending and Prior Litigation Date specified in Item 6 of the Declarations. Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under this Insuring Agreement.  Such Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**.

**2.    DEFINITIONS**

   Whether used in the singular or plural, the following terms shall have the meanings specified below:

   **A.    "Benefits"** means all compensation other than salary, wages, bonuses, and **Stock Benefits.  Benefits** include, without limitation, retirement benefits, perquisites, vacation and sick days, medical or insurance benefits, and deferred compensation.

   **B.    "Claim"** means any:

   **1.**    written demand for monetary or non − monetary relief commenced by the **Insured's** receipt of such demand;

   **2.**    civil proceeding commenced by the service upon the **Insured** of a complaint or similar pleading;

   **3.**    formal administrative or regulatory proceeding commenced by the filing of a notice of charges or any similar document, including, without limitation, proceedings before the Equal Employment Opportunity Commission and the Office of Federal Contract Compliance Program;

   **4.**    formal administrative or regulatory investigation commenced by the service upon or other receipt by an **Insured** of a written notice from an investigating authority identifying the **Insured** as a target against whom an administrative or regulatory proceeding may be commenced; or

   **5.**    written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim** as described above, commenced by the **Insured's** receipt of such request.

Notwithstanding the above, **Claim** shall not include any labor or grievance proceeding initiated pursuant to any collective bargaining agreement.

**C.** **"Employee"** means any natural person whose labor or service was, is or shall be engaged and directed by any **Insured Organization**, including fulltime, part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any **Independent Contractor**.

**D.** **"Executive"** means any natural person who was, is or shall be a duly elected or appointed:

    **1.** director, officer, or member of the board of managers or management committee of an **Insured Organization**;

    **2.** in-house general counsel of an **Insured Organization**; or

    **3.** manager of an **Insured Organization** organized outside the United States of America if such position is equivalent to those specified in 1 or 2 above.

**E.** **"Insured Person"** means any:

    **1.** **Executive**;

    **2.** **Employee**; or

    **3.** **Independent Contractor**, but only if an **Insured Organization** agrees in writing within 30 days of the making of a **Claim** to provide indemnification to such **Independent Contractor** for any **Loss** arising out of such **Claim**.

**F.** **"Insureds"** means any:

    **1.** **Insured Organization**; or

    **2.** **Insured Person**.

**G.** **"Loss"** means the amount that the **Insureds** are legally obligated to pay resulting from a **Claim**, including, without limitation, damages (including front pay and back pay), settlements, judgments, pre- and post-judgment interest, and **Defense Costs**.

**Loss** shall include: (i) punitive, exemplary and multiple damages; and (ii) liquidated damages awarded pursuant to the Age Discrimination in Employment Act or Equal Pay Act, where insurable by law. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall exclude any:

    **1.** taxes, fines  or penalties imposed by law;

    **2.** matters that are uninsurable under the law pursuant to which this Policy shall be construed;

    **3.** amount for which the **Insureds** are not financially liable or for which the claimants are without legal recourse to the **Insureds**;

    **4.** non-monetary relief;

     **5.** future compensation of a claimant who was, is or shall be hired, promoted or reinstated to employment pursuant to a settlement of, order in or other resolution of a **Claim**;

     **6.** **Stock Benefits**; or

     **7.** compensation earned by or due to the claimant in the course of employment but not paid by an **Insured Organization**, other than back pay or front pay.

**H.** **"Retaliation"** means any actual or alleged negative treatment of any **Executive**, **Employee**, or **Independent Contractor** by any **Insured Persons** in their capacity as such or by any **Insured Organization** in response to any such person:

     **1.** exercising any rights granted under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

     **2.** refusing to violate any law;

     **3.** assisting, testifying in, or cooperating with, a proceeding or investigation regarding violations of law by any **Insured Organization**;

     **4.** disclosing or threatening to disclose any violations of law to a superior or any governmental agency; or

     **5.** filing any claim against any **Insured Organization** under the Federal False Claims Act or any similar law protecting "whistleblowers".

**I.** **"Stock Benefits"** means any offering, plan or agreement between any **Insured Organization** and any **Insured Person** granting stock, stock options or stock appreciation rights in any **Insured Organization** to such **Insured Person**, including, without limitation, restricted stock or any other stock grant. Notwithstanding the foregoing, **Stock Benefits** shall not include employee stock ownership plans or employee stock purchase plans.

**J.** **"Third Party"** means any natural person who is a customer, vendor, service provider or other business invitee of any **Insured Organization**. **Third Party** shall not include **Employees**.

**K.** **"Wrongful Act"** means:

     **1.** regarding Insuring Agreement A, any actual or alleged:

          **a.** wrongful dismissal, discharge or termination of employment, including constructive dismissal, discharge, or termination;

          **b.** employment discrimination based on age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, disability, health status, military or veteran status, or any other protected status specified under federal, state or local law;

          **c.** sexual or other workplace harassment, including, without limitation, hostile work environment;

          **d.** employment-related misrepresentation;

  **e.**  wrongful deprivation of a career opportunity, demotion, failure to employ or promote, discipline of employees or failure to grant tenure;

  **f.**  breach of any oral, written, or implied employment contract or agreement including, without limitation, any obligation arising out of any employee manual, handbook, or policy statement;

  **g.**  **Retaliation**;

  **h.**  negligent evaluation of employees;

  **i.**  employment-related libel, slander, defamation, or invasion of privacy, including the giving of negative or defamatory statements in connection with an employee reference;

  **j.**  violation of the Family and Medical Leave Act; or

  **k.**  infliction of emotional distress or mental anguish, failure to provide or enforce adequate or consistent corporate employment policies and procedures, or negligent hiring, retention, supervision or training of **Employees**, if such conduct relates to matters described in paragraphs a through j above;

  but only if the **Wrongful Act** described in 1.a through 1.k above is committed or attempted: (i) against an **Employee,** applicant for employment with any **Insured Organization**, or **Independent Contractor**; and (ii) by any **Insured Persons** in their capacity as such or by any **Insured Organization**; or

 **2.**  regarding Insuring Agreement B, any actual or alleged discrimination, sexual harassment, or violation of a **Third Party's** civil rights relating to such discrimination or sexual harassment, by any **Insured Persons** in their capacity as such or by any **Insured Organization**.

**3.**  **EXCLUSIONS**

 **A.**  The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured**:

  **1.**  arising from, based upon, or attributable to any fact, circumstance or situation that, before the inception date of this Policy, was the subject of any notice given under any other insurance policy;

  **2.**  arising from, based upon, or attributable to any:

   **a.**  demand, suit or proceeding, or any audit by the Office of Federal Contract Compliance Programs, made or initiated against any **Insured** on or prior to the applicable Pending and Prior Litigation Date in Item 6 of the Declarations; or

   **b**.  any **Wrongful Act** alleged in any such demand, suit, proceeding, or audit or any **Interrelated Wrongful Acts** thereto;

  **3.**  for bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof; provided that this exclusion shall not apply to any **Claim** for emotional distress or mental anguish;

  **4.**  arising from, based upon, or attributable to any:

00 PCD0074 00 04 07                 Page 4 of 6

EXHIBIT B - Page No. 31

      **a.**    discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release, escape, seepage, migration or disposal; or

      **b.**    direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste,

    provided that this exclusion shall not apply to any **Claim** for **Retaliation**;

    **5.**    for any violation of: (i) any law governing workers' compensation, unemployment insurance, social security, disability or pension benefits laws; (ii) **ERISA** (except Section 510 thereof); (iii) the Fair Labor Standards Act (except the Equal Pay Act); (iii) the National Labor Relations Act; (iv) the Worker Adjustment and Retraining Notification Act; (v) the Consolidated Omnibus Budget Reconciliation Act of 1985; (vi) the Occupational Safety and Health Act; or (vii) any similar laws to those mentioned in (i) through (vi) above; provided that this exclusion shall not apply to any **Claim** for **Retaliation**;

    **6.**    arising from, based upon, or attributable to any liability of others assumed by any **Insured** under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement; or

    **7.**    arising from, based upon, or attributable to any breach of contract or agreement specifying the terms of an **Insured Organization's** engagement of an **Independent Contractor**.

**B.**    Other than **Defense Costs**, the **Insurer** shall not pay **Loss** for any **Claim** against an **Insured**:

    **1.**    for costs of any accommodation required by the Americans with Disabilities Act or any similar law;

    **2.**    for employment termination severance payments, provided that this exclusion shall not apply to any payments negotiated with and consented to by the **Insurer** as part of a settlement;

    **3.**    for **Benefits** or their equivalent value, provided that this exclusion shall not apply to any **Claim** for wrongful dismissal, discharge or termination of employment; or

    **4.**    arising from, based upon, or attributable to any breach of any written employment contract or agreement, provided that this exclusion shall not apply to any liability that would have been incurred in the absence of such written employment contract or agreement.

**C.**    Regarding Insuring Agreement B, the **Insurer** shall not pay **Loss** for any **Claim** against an **Insured** arising from, based upon, or attributable to any price discrimination or violation of any anti-trust or other law designed to protect competition or prevent unfair trade practices.

## 4.    OTHER INSURANCE

**A.**    To the extent that any **Claim** is covered under this **Liability Coverage Part** and any other insurance, the coverage provided under this **Liability Coverage Part** shall be primary.

**B.**   Notwithstanding the above:

   **1.**   regarding any **Claim** made against a leased or temporary **Employee** or an **Independent Contractor,** coverage under this **Liability Coverage Part** shall be excess of, and not contribute with, any applicable insurance insuring the employee leasing company, temporary employee agency, or **Independent Contractor**; and

   **2.**   regarding any **Claim** made by or on behalf of a **Third Party**, coverage under this **Liability Coverage Part** shall be excess of, and not contribute with, any other applicable insurance insuring the **Insureds** on a duty to defend basis,

regardless of whether such other insurance is stated to be excess, contributory, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other insurance to this Policy's Policy Number.

# FIDUCIARY LIABILITY
# COVERAGE PART

## TABLE OF CONTENTS

1.    INSURING AGREEMENTS

2.    DEFINITIONS

3.    EXCLUSIONS

4.    TERMINATED PLAN COVERAGE

# FIDUCIARY LIABILITY

# COVERAGE PART

1.  **INSURING AGREEMENTS**

    A.  **Fiduciary Liability**

    The **Insurer** shall pay **Loss** on behalf of the **Insureds** resulting from a **Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds** or by any person for whose **Wrongful Acts** the **Insureds** are legally responsible.

    B.  **Settlement Programs**

    The **Insurer** shall pay a **Voluntary Settlement** and **Defense Costs** on behalf of the **Insureds** resulting from a **Settlement Program Notice** first given to the **Insurer** during the **Policy Period** or Extended Reporting Period, if applicable, provided that such **Voluntary Settlement** and **Defense Costs** are incurred after such **Settlement Program Notice** is first given to the **Insurer**.

    This Insuring Agreement shall be subject to a Sublimit of Liability of $100,000.  Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under this Insuring Agreement.  Such Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**.  No Deductible shall apply to this Insuring Agreement.

2.  **DEFINITIONS**

    Whether used in the singular or plural, the following terms shall have the meanings specified below:

    A.  **"Administration"** means:

        1.  advising, counseling or giving notice to **Employees**, participants or beneficiaries regarding any **Plan**;

        2.  providing interpretations regarding any **Plan**; or

        3.  handling records or enrolling, terminating or canceling **Employees**, participants or beneficiaries regarding any **Plan**.

    B.  **"Claim"** means any:

        1.  written demand for monetary or non-monetary relief commenced by the **Insureds'** receipt of such demand;

        2.  civil proceeding commenced by the service upon the **Insureds** of a complaint or similar pleading;

        3.  criminal proceeding commenced by the return of an indictment, information or similar pleading;

        4.  formal administrative or regulatory proceeding commenced by the filing of a notice of

charges or any similar document;

5.     formal administrative or regulatory governmental investigation (including a fact-finding investigation by the Department of Labor, Pension Benefit Guaranty Corporation or similar authority) of an **Insured** commenced by the service upon or other receipt by such **Insured** of a written notice from an investigating authority identifying such **Insured** as a target against whom a formal proceeding may be commenced;

6.     written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim** as described in 1 through 5 above, commenced by the **Insured's** receipt of such request; or

7.     regarding Insuring Agreement B, a **Settlement Program Notice**.

C.     **"Employee"** means any natural person whose labor or service was, is or shall be engaged by and directed by any **Insured Organization** or **Plan**, including fulltime, part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any **Independent Contractor**.

D.     **"Executive"** means any natural person who was, is or shall be a duly elected or appointed:

1.     director, officer, or member of the board of managers or management committee of an **Insured Organization**;

2.     in-house general counsel of an **Insured Organization**; or

3.     manager of an **Insured Organization** organized outside the United States of America if such position is equivalent to those specified in 1 or 2 above.

E.     **"Insured Person"** means any:

1.     **Executive**;

2.     **Employee**;

3.     natural person who was, is or shall be a duly elected or appointed trustee of any **Plan**; or

4.     a fiduciary of a **Plan** if such person is specifically included as an **Insured Person** in a written endorsement issued by the **Insurer**.

F.     **"Insureds"** means any:

1.     **Insured Organization**;

2.     **Plan**; or

3.     **Insured Persons**.

G.     **"Loss"** means the amount that the **Insureds** are legally obligated to pay resulting from a **Claim**, including, without limitation, damages, settlements, judgments, pre- and post-judgment interest, and **Defense Costs**. Regarding Insuring Agreement B, **"Loss"** means **Voluntary Settlements** and **Defense Costs**.

**Loss** shall include punitive and exemplary damages where insurable by law. The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits

coverage of such damages.

**Loss** shall exclude any:

1. taxes, fines or penalties imposed by law other than any;

   a. five percent (5%) or less, or twenty percent (20%) or less, civil penalties imposed under Section 502(i) or (l), respectively, of **ERISA**;

   b. civil penalties imposed by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority in the United Kingdom or any successor thereto; provided any coverage for such civil penalties applies only if the funds or assets of the subject **Plan** are not used to fund, pay or reimburse the premium for this Policy;

   c. civil penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, provided that the **Insurer's** maximum aggregate liability for all such civil money penalties under this Policy shall be subject to a sublimit of $25,000 that shall be the maximum aggregate amount that the **Insurer** shall pay for all such penalties and shall be part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**; or

   d. solely with respect to Insuring Agreement B, **Voluntary Settlements**;

2. multiple portion of any multiplied damage award;

3. matters that are uninsurable under the law pursuant to which this Policy shall be construed;

4. amount for which the **Insureds** are not financially liable or for which the claimants are without legal recourse to the **Insureds**; or

5. non-monetary relief.

H. **"Plan"** means:

   1. any **Sponsored Plan**; or

   2. any government-mandated insurance program for workers compensation, unemployment, social security or disability benefits for **Employees**.

I. "**Settlement Program**" means any voluntary compliance resolution program or similar voluntary settlement program administered by the United States Internal Revenue Service, United States Department of Labor or any other domestic or foreign governmental authority. Such programs include, without limitation, the Employee Plans Compliance Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-in Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correction Program, Delinquent Filer Voluntary Compliance Program, and Voluntary Fiduciary Correction Program.

J. "**Settlement Program Notice**" means prior written notice to the **Insurer** by any **Insured** of the **Insured's** intent to enter into a **Settlement Program**.

K.    **"Sponsored Plan"** means any:

    **1.**    Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, as each is defined in **ERISA**, operated solely by any **Insured Organization**, or jointly by any **Insured Organization** and a labor organization, for the benefit of **Employees** only;

    **2.**    employee benefit plan or program not subject to **ERISA** sponsored solely by any **Insured Organization** for the benefit of **Employees** only, including any fringe benefit or excess benefit plan;

    **3.**    employee benefit plan or program otherwise described in paragraphs 1. or 2. above while such plan or program is being actively developed, formed or proposed by any **Insured Organization** prior to the formal creation of such plan or program; provided, however, no coverage is afforded for any **Claim** against an **Insured** in a settlor or similar uninsured capacity with respect to any plan or program; or

    **4.**    plan, fund, or program specifically included as a **Sponsored Plan** in a written endorsement issued by the **Insurer**.

**Sponsored Plan** shall not include any multi-employer plan or employee stock ownership plan, unless such plan is specifically included as a **Sponsored Plan** by a written endorsement issued by the **Insurer**.

L.    **"Voluntary Settlement"** means any fees, fines, or penalties paid by an **Insured** to a governmental authority pursuant to a **Settlement Program** for the actual or alleged inadvertent non-compliance by a **Plan** with any statute, rule or regulation; provided that **Voluntary Settlement** shall not include (i) any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (ii) any fees, fines, or penalties relating to a **Plan** which, as of the earlier of inception date of this Policy or the inception date of the first policy in an uninterrupted series of policies issued by the **Insurer** of which this **Policy** is a direct or indirect renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

M.    **"Wrongful Act"** means any actual or alleged:

    **1.**    breach of the responsibilities, obligations or duties imposed by **ERISA** upon fiduciaries of any **Sponsored Plan** in their capacity as such fiduciaries;

    **2.**    act, error or omission in **Administration** by any **Insured** in their capacity as such; or

    **3.**    matter claimed against any **Insured Persons** solely by reason of their service as a fiduciary of any **Sponsored Plan**.

**3.    EXCLUSIONS**

A.    The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured**:

    **1.**    arising from, based upon, or attributable to any fact, circumstance or situation that, before the inception date of this Policy, was the subject of any notice given under any other insurance policy;

    **2.**    arising from, based upon, or attributable to any:

        **a.**    demand, suit or proceeding made or initiated against any **Insured** on or prior to the applicable Pending and Prior Litigation Date in Item 6 of the Declarations; or

      **b.**    **Wrongful Act** specified in such prior demand, suit or proceeding or any **Interrelated Wrongful Acts** thereto;

**3.**    for bodily injury, sickness, disease, emotional distress, mental anguish, or death of any person, or damage to or destruction of any tangible property, including loss of use thereof;

**4.**    arising from, based upon, or attributable to any:

      **a.**    discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**, nuclear material or nuclear waste or any threat of such discharge, dispersal, release, escape, seepage, migration or disposal; or

      **b.**    direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, nuclear material or nuclear waste,

provided that this exclusion shall not apply to any (i) **Claim** by or on behalf of a beneficiary or participant in any **Sponsored Plan** for diminution in value of any securities owned by the **Sponsored Plan** in any organization other than any **Insured Organization**; or (ii) **Non-Indemnifiable Loss**.

**5.**    arising from, based upon, or attributable to any liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability:

      **a.**    would have been incurred in the absence of such contract or agreement; or

      **b.**    was assumed in accordance with or under an agreement or declaration of trust pursuant to which a **Plan** was established;

**6.**    for the failure of any **Insureds** to comply with any workers' compensation, unemployment insurance, social security, or disability benefits law or any similar law except:

      **a.**    the Consolidated Omnibus Budget Reconciliation Act of 1985; or

      **b.**    the Health Insurance Portability and Accountability Act of 1996;

**7.**    for discrimination in violation of any law other than **ERISA**;

**8.**    arising from, based upon, or attributable to the gaining, in fact, of any personal profit, remuneration or advantage to which such **Insured** is not legally entitled; or

**9.**    arising from, based upon, or attributable to any deliberately fraudulent or criminal act or omission or willful violation of law by such **Insured** if a judgment or other final adjudication in such **Claim** or another proceeding establishes that such act, omission or violation occurred.

Regarding exclusions 8 and 9 above: (i) no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**; and (ii) only a **Wrongful Act** by a past, present or future chairman of the board, chief executive officer, president, chief operating officer, chief financial officer, general counsel or limited liability company manager of any **Insured Organization** or a past, present or future **Plan** trustee shall be imputed to any **Insured Organization** or **Plan**.

**B.**    Other than **Defense Costs**, the Insurer shall not pay **Loss** for any **Claim** against an

**Insured** for:

**1.**     failure to fund, or collect contributions owed to, any **Plan**;

**2.**     return or reversion to an employer of any contribution or asset of any **Plan**; or

**3.**     benefits under any **Plan**, including benefits that would be due under any **Plan** if such **Plan** complied with all applicable laws, provided that this exclusion shall not apply to the extent that an **Insured** is a natural person and the benefits are payable by such **Insured** as a personal obligation.

## 4.     TERMINATED PLAN COVERAGE

If, before or during the **Policy Period**, any **Plan** is terminated, coverage for such **Plan** and its **Insureds** shall continue until termination of this Policy.  Such coverage continuation shall apply to covered **Claims** for **Wrongful Acts** occurring prior to or after the date the **Plan** was terminated.

**CRIME COVERAGE PART**

# TABLE OF CONTENTS

1.   **INSURING AGREEMENTS**

2.   **DEFINITIONS**

3.   **EXCLUSIONS**

4.   **LIMIT OF LIABILITY AND DEDUCTIBLE**

5.   **SPONSORED PLAN COVERAGE**

6.   **OWNERSHIP OF PROPERTY; INTERESTS COVERED**

7   **DEFENSE COSTS COVERAGE (FORGERY OR ALTERATION)**

8.   **INVESTIGATION COSTS COVERAGE (ALL INSURING AGREEMENTS)**

9.   **PRIOR LOSS COVERAGE**

10.  **CALCULATION OF LOSS**

11.  **LOSS REPORTING RIGHTS AND DUTIES**

# CRIME COVERAGE PART

1. **INSURING AGREEMENTS**

   A. **Employee Theft**

   The **Insurer** shall pay **Loss** by an **Insured** resulting from any **Employee**, acting alone or in collusion with others, committing any:

   1. **Theft** of **Money**, **Property**, or **Securities**; or

   2. **Forgery**.

   B. **Customer Property**

   The **Insurer** shall pay **Loss** by a **Customer** resulting from any **Employee**, not in collusion with such **Customer's** employees, committing any:

   1. **Theft** of **Money**, **Property**, or **Securities**; or

   2. **Forgery**.

   C. **Inside The Premises**

   The **Insurer** shall pay **Loss** by an **Insured**:

   1. of **Money** or **Securities** while inside the **Premises** or any **Banking Premises** resulting from any:

      a. **Third Party** committing any **Robbery**, **Safe Burglary**, or **Theft**; or

      b destruction or disappearance; or

   2. inside the **Premises** resulting from any **Third Party** committing any:

      a. damage to **Property** during any **Robbery** or attempted **Robbery**;

      b. damage to **Property** contained inside any safe during any **Safe Burglary** or attempted **Safe Burglary**;

      c. damage to a locked safe, cash drawer, cash box or cash register during any felonious entry or attempted felonious entry;

      d. felonious abstraction of a locked safe, cash drawer, cash box or cash register; or

      e. damage to the **Premises** during any **Safe Burglary** or attempted **Safe Burglary** or **Robbery** or attempted **Robbery**.

   D. **Outside The Premises**

   The **Insurer** shall pay **Loss** by an **Insured**:

   1. of **Money** or **Securities** while **In Transit**, or while temporarily inside the home of an **Employee** or a partner of an **Insured Organization**, resulting from any:

      **a.**    **Third Party** committing any **Robbery** or **Theft**; or

      **b.**    destruction or disappearance; or

  **2.**    resulting from any **Third Party** committing any:

      **a.**    damage to **Property** while **In Transit** during any **Robbery** or attempted **Robbery**; or

      **b.**    **Theft** of **Property** while temporarily inside the home of an **Employee** or a partner of an **Insured Organization**.

**E.**    **Forgery or Alteration**

The **Insurer** shall pay **Loss** by an **Insured** resulting from any **Third Party** committing any:

  **1.**    **Forgery** of a **Financial Instrument**; or

  **2.**    **Alteration** of a **Financial Instrument**.

**F.**    **Computer Fraud or Fraudulent Transfer Instructions**

The **Insurer** shall pay **Loss** by an **Insured** of **Money** or **Securities** resulting from any **Third Party** committing any:

  **1.**    **Computer Fraud**; or

  **2.**    **Fraudulent Transfer Instructions**.

**G.**    **Currency Fraud**

The **Insurer** shall pay **Loss** by an **Insured** resulting from any **Third Party** committing any **Currency Fraud**.

**2.**    **DEFINITIONS**

Whether used in the singular or plural, the following terms shall have the meanings specified below:

**A.**    "**Alteration**" means the material modification of an original document by a person acting without authority and with the intent to deceive.

**B.**    "**Banking Premises**" means the interior portion of any building occupied by a banking institution or similar safe depository.

**C.**    "**Computer Fraud**" means **Theft** directed solely against an **Insured Organization** committed through the use of any computer or computer network, including all input, output, processing, storage, and communication devices connected to any computer or computer network.

**D.**    "**Counterfeit**" means an imitation of an actual valid original that is intended to deceive and to be taken as the original.

**E.**    "**Currency Fraud**" means the good faith acceptance by an **Insured Organization** in the regular course of business and in exchange for merchandise, **Money**, or services of any:

    **1.**    **Counterfeit** United States of America or Canadian post office or express money order, issued or purporting to have been issued by any post office or express company that is not paid upon presentation; or

    **2.**    **Counterfeit** United States of America or Canadian paper currency.

**F.**    "**Customer**" means any person or entity to which an **Insured Organization** provides goods or services for consideration.

**G**    "**Data**" means information contained in any records, accounts, microfilms, tapes or other paper or electronic records.

**H.**    "**Discovery**" means knowledge acquired by an **Executive** or a **Risk Manager** that would cause a reasonable person to believe (i) a covered **Loss** has occurred or (ii) that circumstances have arisen that may subsequently result in a covered **Loss**, including **Loss**:

    **1.**    sustained prior to the inception date of this Policy specified in Item 2 of the Declarations;

    **2.**    not exceeding the applicable Deductible specified in Item 6 of the Declarations; or

    **3.**    for which exact details are unknown.

**Discovery** shall not include knowledge acquired by an **Executive** or a **Risk Manager** acting alone or in collusion with an **Employee** as a participant in a **Theft** or **Forgery**.

**I.**    "**Employee**" means any:

    **1.**    natural person whose labor or service is engaged and directed by any **Insured Organization**, including fulltime, part-time, seasonal, leased and temporary employees as well as volunteers; or

    **2.**    natural person fiduciary, trustee, administrator or employee of a **Sponsored Plan** and any other natural person required to be bonded in connection with a **Sponsored Plan** by Title 1 of **ERISA**.

**Employee** shall not include any: (i) **Executive** except to the extent that such person is performing acts coming within the scope of the usual duties of a nonexecutive **Employee**; (ii) volunteer acting as a fund solicitor during fund-raising activities; or (iii) **Independent Contractor**.

**J.**    "**Executive**" means any natural person who is a duly elected or appointed:

    **1.**    director, officer, or member of the board of managers or management committee of an **Insured Organization**;

    **2.**    in-house general counsel of an **Insured Organization**; or

    **3.**    manager of an **Insured Organization** organized outside the United States of America if such position is equivalent to those specified in 1 or 2 above.

**K.**    "**Financial Instrument**" means checks, drafts, or similar orders to pay a specific amount of money that are made, drawn by or drawn upon an **Insured Organization** or by anyone acting as an agent of an **Insured Organization**, or that are purported to have been so made or drawn.

L.   "**Forgery**" means the signing of another natural person's name with the intent to deceive. **Forgery** shall not include a signature that consists in whole or in part of one's own name, signed with or without authority, in any capacity for any purpose.   Mechanically or electronically produced or reproduced signatures shall be treated the same as hand-written signatures.

M.   "**Fraudulent Transfer Instructions**" means any fraudulent written, electronic, telegraphic, cable, teletype or telephonic instructions issued to a financial institution directing such institution to initiate a transfer of **Money** or **Securities** from any account maintained by an **Insured Organization** at such institution which instructions purport to have been authorized by such **Insured Organization** but were, in fact, fraudulently transmitted by someone other than the **Insured Organization**.

N.   "**In Transit**" means a conveyance outside the **Premises** by an **Insured Organization** within the custody of any:

   1.   **Employee** or partner of an **Insured Organization**; or

   2.   authorized custodian of an **Insured Organization**.

   Such conveyance begins upon receipt of the conveyance by any person described in 1 or 2 above from any **Insured Organization**, and ceases upon delivery of the conveyance to the designated recipient or its agent.

O.   "**Insureds**" means any:

   1.   **Insured Organization**; or

   2.   **Sponsored Plan**.

   **Insureds** shall not include a **Customer**.

P.   "**Investigation Costs**" means reasonable and necessary expenses incurred by an **Insured** with the **Insurer's** prior written consent to establish the existence and amount of a covered **Loss**.   **Investigation Costs** shall not include any compensation, benefit expenses, or overhead of any **Insureds** or any expenses incurred by any **Customer**.

Q.   "**Loss**" means direct loss sustained.  If Investigation Costs Coverage is elected in Item 6 of the Declarations, "**Loss**" shall also mean **Investigation Costs**.

R.   "**Money**" means currency, coin, and bank notes in current use and having a face value.

S.   "**Premises**" means the interior portion of a building occupied by an **Insured Organization** to conduct its business.

T.   "**Property**" means tangible property other than **Money** or **Securities**.   **Property** shall not include **Data**.

U.   "**Risk Manager**" means an **Employee** designated by an **Insured Organization** to effect and maintain insurance for the **Insured Organization**.

V.   "**Robbery**" means a **Theft** from the care and custody of any:

   1.   **Employee**; or

2.    authorized custodian of an **Insured Organization** other than a watchman, porter or janitor,

by violence or threat of violence committed in the presence and cognizance of such person.

**W.**    "**Safe Burglary**" means **Theft** from a locked vault or safe located inside the **Premises** by forcible or violent entry as evidenced by visible marks**.**

**X.**    "**Securities**" means negotiable and non-negotiable instruments representing either **Money** or **Property**.

**Y.**    "**Sponsored Plan**" means any:

1.    Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, as each are defined in **ERISA**, operated solely by any **Insured Organization**, or jointly by any **Insured Organization** and a labor organization, for the benefit of **Employees** only;

2.    other employee benefit plan or program not subject to **ERISA** that is sponsored solely by any **Insured Organization** for the benefit of **Employees** only; or

3.    plan, fund, or program specifically included as a **Sponsored Plan** by a written endorsement issued by the **Insurer**.

**Sponsored Plan** shall not include any multi-employer plan.

**Z.**    "**Theft**" means any unlawful taking.

**AA.**    "**Third Party**" means any natural person other than:

1.    an **Employee** or an **Executive**; or

2.    a person acting in collusion with an **Employee** or an **Executive**.

**3.**    **EXCLUSIONS**

**A.**    The **Insurer** shall not be liable to pay **Loss** resulting from any:

1.    **Theft**, **Computer Fraud**, **Fraudulent Transfer Instructions** or any other fraudulent, dishonest or criminal act (other than **Robbery** or **Safe Burglary**), by any authorized representative of the **Insured Organization**, other than an **Employee**, provided that this exclusion shall not apply if an authorized representative is acting in collusion with any **Employee**;

2.    fire, provided that this exclusion shall not apply to:

    a.    **Loss** of **Money** or **Securities**; or

    b.    damage to any safe or vault caused by the application of fire during any **Safe Burglary** or attempted **Safe Burglary**;

3.    **Theft** or **Forgery** by a partner of an **Insured Organization** whether acting alone or in collusion with others, provided that if such **Theft** or **Forgery** would have otherwise been a covered **Loss** if committed by someone else, the **Insurer** shall pay a percentage of such **Loss** equal to the percentage ownership of the innocent partners of such **Insured Organization** on the day immediately preceding the date of **Discovery**;

00 PCD0076 00 04 07                                                    Page 5 of 11

4.  authorized or unauthorized trading, regardless of whether such trading is: (i) in the name of the **Insured** or another; (ii) in a genuine or fictitious account; or (iii) with or without the knowledge of any **Insured**; provided that this exclusion shall not apply to **Loss** caused by **Theft** or **Forgery** resulting in improper financial gain to an **Employee** (**Loss** as used in this exclusion means only the amount of improper financial gain to such **Employee** and shall not include any compensation paid by an **Insured Organization** to such **Employee** such as salary, bonuses, incentive payments commissions, or employee benefits);

5.  misappropriation or loss of use of trade secrets, confidential processing methods, or other confidential information of any kind;

6.  declared or undeclared war, civil war, insurrection, rebellion or revolution, military, naval or usurped power, governmental intervention or authority, expropriation or nationalization or any act or condition incident or related to any of the foregoing;

7.  unrealized loss of income, including, without limitation, interest and dividends;

8.  indirect or consequential loss of any nature, including, without limitation, fines, penalties, multiple or punitive damages; provided that this exclusion shall not apply to otherwise covered **Investigation Costs** if Investigation Costs Coverage is elected in Item 6 of the Declarations;

9.  **Employee** to the extent that **Loss** occurs:

    a.  after an **Executive** or **Risk Manager** acquires knowledge of fraud or dishonesty committed by such **Employee** involving **Money**, **Securities** or **Property**, regardless of whether such fraud or dishonesty occurred prior to or during employment with an **Insured;** or

    b.  more than sixty (60) days after termination of such **Employee**;

10. expenses incurred by an **Insured** in defending or prosecuting any legal proceeding or claim; provided that this exclusion shall not apply to the coverage provided under Section 7. Defense Costs Coverage (Forgery or Alteration);

11. **Insured** knowingly giving or surrendering **Money**, **Property**, or **Securities** in any exchange or purchase with a **Third Party** not in collusion with an **Employee**; provided that this exclusion shall not apply to **Currency Fraud**;

12. **Loss** sustained by one **Insured** to the advantage of any other **Insured**;

13. disappearance of, or damage to, **Money**, **Property**, or **Securities** while in the custody of any bank, trust company, similar recognized place of safe deposit, armored motor vehicle company or any person duly authorized by an **Insured Organization** to have custody of the property; provided that this exclusion shall not apply to **Loss** excess of the amount recovered or received by an **Insured Organization** under:

    a.  the **Insured Organization's** contract, if any, with, or insurance carried by, any of the foregoing; or

    b.  any other insurance or indemnity in force; or

14. nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

**B.** Regarding Insuring Agreements A and B, the **Insurer** shall not be liable to pay **Loss** resulting from any:

    **1.** unidentified **Employee**; or

    **2.** agent, broker, factor, commission merchant, consignee, contractor, independent contractor or other representative of the same general character.

**C.** Regarding Insuring Agreements C and D, the **Insurer** shall not be liable to pay **Loss** resulting from:

    **1.** **Forgery**, **Computer Fraud** or **Fraudulent Transfer Instructions**; or

    **2.** destruction, disappearance or damage to **Money**, **Securities** or **Property** while in the mail or in the custody of a carrier for hire other than an armored motor vehicle company.

**D.** Regarding Insuring Agreements C, D, and F, the **Insurer** shall not be liable to pay **Loss** resulting from kidnap, ransom or other extortion payment provided that this exclusion shall not apply to **Robbery**.

**E.** Regarding Insuring Agreement E, the **Insurer** shall not be liable to pay **Loss** resulting from **Forgery** or **Alteration** of any:

    **1.** **Financial Instrument** committed by any **Third Party** in collusion with any **Employee**; or

    **2.** registered or coupon obligations issued or purported to have been issued by the **Insured**.

**F.** If the Loss Sustained coverage option is elected in Item 6 of the Declarations, the **Insurer** shall not be liable to pay **Loss** unless sustained prior to the termination of this Policy and **Discovery** occurs and written notice thereof is given to the **Insurer** not later than:

    **1.** sixty (60) days following such termination; or

    **2.** one (1) year following such termination if the termination results from the voluntary liquidation or voluntary dissolution of the **Named Organization**.

**G.** If the Loss Discovered coverage option is elected in Item 6 of the Declarations, the **Insurer** shall not be liable to pay **Loss** unless:

    **1.** **Discovery** occurs and written notice thereof is given to the **Insurer** prior to the termination of this Policy ; or

    **2.** sustained prior to the termination of this Policy and **Discovery** occurs and written notice thereof is given to the **Insurer** within one (1) year following such termination if the termination results from the voluntary liquidation or voluntary dissolution of the **Named Organization**.

**H.** The **Insurer** shall not be liable to pay **Loss** for which **Discovery** occurred prior to the inception date of this Policy specified in Item 2 of the Declarations.

4.    **LIMIT OF LIABILITY AND DEDUCTIBLE**

    **A.**    The **Insurer's** maximum aggregate liability for each single **Loss** under each elected Insuring Agreement shall not exceed the applicable Limit of Liability specified in Item 6 of the Declarations, regardless of the number of **Insureds** sustaining such **Loss**.

    **B.**    All **Loss** resulting from a single act or any number of acts of the same **Employee** or **Third Party**, regardless of whether such act or acts occurred before or during the **Policy Period**, shall be treated as a single **Loss** and the applicable Limit of Liability of this Coverage Part shall apply, subject to Section 9. Prior Loss Coverage.

    **C.**    If **Loss** is covered under more than one Insuring Agreement of this Coverage Part, the maximum amount payable under this Coverage Part shall not exceed the largest applicable Limit of Liability of any such Insuring Agreement.

    **D.**    If there is more than one **Insured**, the maximum liability of the **Insurer** for any single **Loss** sustained by more than one **Insured** shall not exceed the amount for which the **Insurer** would have been liable if the single **Loss** had been sustained by one **Insured**.

    **E.**    The amount that the **Insurer** shall pay for any single **Loss** shall not be cumulative from **Policy Period** to **Policy Period**.

    **F.**    The **Insurer's** liability under this Coverage Part shall apply only to that part of each **Loss** excess of the applicable Deductible specified in Item 6 of the Declarations.

5.    **SPONSORED PLAN COVERAGE**

    **A.**    Payment of **Loss** incurred by a **Sponsored Plan** shall be paid by the **Insurer** to the **Named Organization** for the use and benefit of such **Sponsored Plan**.

    **B.**    The Limit of Liability applicable to any single **Loss** incurred by one or more **Sponsored Plans** shall be the applicable Limit of Liability specified in item 6 of the Declarations provided that such amount exceeds the minimum limit of liability for each **Sponsored Plan** (the "Minimum Limit of Liability") incurring such single **Loss**.

    **C.**    The Minimum Limit of Liability for each **Sponsored Plan** shall equal the lesser of:

        **1.**    ten percent (10%) of such **Sponsored Plan's** assets as of the beginning of such **Sponsored Plan's** fiscal year; or

        **2.**    $500,000.

    **D.**    If a single **Loss** is incurred by more than one **Sponsored Plan**, then the Limit of Liability applicable to such **Loss** shall be the greater of:

        **1.**    the applicable Limit of Liability specified in item 6 of the Declarations; or

        **2.**    the sum of the Minimum Limit of Liability for each **Sponsored Plan** incurring such single **Loss**.

    **E.**    Notwithstanding any other provision of this Policy, no Deductible shall apply to **Loss** by any **Sponsored Plan**.

6.     **OWNERSHIP OF PROPERTY; INTERESTS COVERED**

    **A.**    Regarding all Insuring Agreements other than Insuring Agreement B, coverage shall only apply to **Money**, **Property** or **Securities** owned by the **Insured**, for which the **Insured** is legally liable, or held by the **Insured** whether or not the **Insured** is liable, provided that:

        **1.**    the **Insurer** shall not be liable for damage to the **Premises** unless the **Insured Organization** is the owner or is liable for such damage; and

        **2.**    regarding Insuring Agreement A, no coverage shall apply for **Money**, **Property** or **Securities** of a **Customer**.

    **B.**    Regarding Insuring Agreement B, coverage shall only apply to **Money**, **Property** or **Securities** of a **Customer** held by the **Insured Organization** or for which the **Insured Organization** is legally liable.

7.     **DEFENSE COSTS COVERAGE (FORGERY OR ALTERATION)**

Regarding Insuring Agreement E, coverage shall include reasonable attorneys' fees and court costs incurred and paid with the **Insurer's** prior written consent in defending an **Insured Organization** or an **Insured Organization's** financial institution in any legal proceeding brought against it to enforce payment of a **Financial Instrument**.   The coverage provided under this Section shall be part of, and not in addition to, the limit of liability specified in Item 6 of the Declarations for Insuring Agreement E.

8.     **INVESTIGATION COSTS COVERAGE (ALL INSURING AGREEMENTS)**

    **A.**    If Investigation Costs Coverage is elected in Item 6 of the Declarations, the **Insurer** shall pay **Investigation Costs** incurred by any **Insured** resulting from any **Loss** covered under Insuring Agreements A through G provided that such **Loss** exceeds the Deductible applicable to the relevant Insuring Agreement.

    **B.**    This coverage shall be subject to the Sublimit of Liability specified in Item 6 of the Declarations. Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under this coverage. Such Sublimit of Liability shall be part of, and not in addition to, the Limits of Liability applicable to the above Insurance Agreements. Other than as specified above, no Deductible shall apply to this coverage.

9.     **PRIOR LOSS COVERAGE**

    **A.**    If Loss Sustained Coverage is elected in Item 6 of the Declarations, coverage shall be available under this Policy for **Loss** prior to the inception date of this Policy specified in Item 2 of the Declarations, or the effective date of any coverage for any additional **Insureds** or coverage added by endorsement, provided that:

        **1.**    an **Insured** or a predecessor in interest of such **Insured** carried a prior bond or policy that afforded coverage for such **Loss** during the period of such prior bond or policy;

        **2.**    such coverage continued without interruption from the time of such **Loss** until the inception date of this Policy or the effective date specified above;

        **3.**    **Discovery** occurred after the time to report such **Loss** had expired under the last such bond or policy;

4.    some or all of the coverage of an **Insuring Agreement** under this Coverage Part would be applicable to such **Loss**;

5.    if such prior bond or policy carried by an **Insured** or predecessor in interest of such **Insured** was issued by the **Insurer** or its affiliates, such prior bond or policy shall terminate as of the inception date of this Policy and no coverage shall be provided under such prior bond or policy; and

6.    the **Insurer's** maximum liability for the prior **Loss** shall not exceed the lesser of either: (i) the limit of liability of the policy immediately preceding this Policy; or (ii) the applicable Limit of Liability specified in Item 6 of the Declarations.

**B.**    If Loss Discovered Coverage is elected in Item 6 of the Declarations, coverage shall be available for **Loss** prior to the inception date of this Policy specified in Item 2 of the Declarations, or the effective date of coverage for any additional **Insureds** or coverage added by endorsement, provided that:

1.    some or all of the coverage of an **Insuring Agreement** under this Coverage Part would be applicable to such **Loss**;

2.    if an **Insured** or a predecessor in interest of such **Insured** carried a prior bond or policy that afforded coverage for **Loss** and was not issued by the **Insurer** or its affiliates and **Discovery** of such **Loss** occurred prior to the expiration of the time allowed for discovery under the last such bond or policy, then no coverage shall be available under this Policy unless **Loss** otherwise covered under the prior bond or policy exceeds the limit of liability of the last such prior bond or policy in which case this Policy shall provide excess coverage over such prior bond or policy subject to all of the terms and conditions of this Policy; and

3.    if an **Insured** or a predecessor in interest of such **Insured** carried a prior bond or policy that afforded coverage for a **Loss** and was issued by the **Insurer** or its affiliates, such prior bond or policy shall terminate as of the inception date of this Policy and no coverage shall be provided under such prior bond or policy.

**C.**    Except as specified in **A** and **B** above, there shall be no coverage under this Coverage Part for **Loss** prior to the:(i) inception date of this Policy specified in Item 2 of the Declarations; or (ii) effective date of coverage for any additional **Insureds** or coverage added by endorsement.

**10.**    **CALCULATION OF LOSS**

**A.**    For **Loss** of **Securities**, the **Insurer** shall pay the lesser of either:

1.    the actual market value of lost, damaged or destroyed **Securities**, but only up to and including their value at the close of business on the business day immediately preceding the **Discovery** of such **Loss**;

2.    the cost of replacing **Securities**; or

3.    the cost to post a Lost Securities Bond in connection with issuing duplicates of the **Securities**.

**B.**    For **Loss** of books of account or other records, the **Insurer** shall pay the cost of blank books, pages or tapes or other blank materials to replace lost or damaged books of account or other records.

**C.**     For **Loss** of **Property**, the **Insurer** shall pay the lesser of either:

    **1.**     the price paid by an **Insured** for the **Property**; or

    **2.**     the cost to repair or replace **Property** with that of like kind, quality and value at the time that the **Named Organization** furnishes a proof of loss pursuant to Section 11. Loss Reporting Rights and Duties.

**D.**     For **Loss** of foreign currency, the **Insurer** shall pay the United States of America dollar equivalent of foreign currency determined by the rate of exchange on the date of **Discovery** of such **Loss**.

**11.     LOSS REPORTING RIGHTS AND DUTIES**

**A.**     Knowledge possessed by any **Insured** or **Discovery** shall be deemed knowledge possessed or **Discovery** by all **Insureds**.

**B.**     Upon **Discovery** and as a condition precedent to coverage, the **Named Organization** shall provide to the **Insurer**:

    **1.**     written notice at the earliest practicable moment, but no later than thirty (30) days after **Discovery**;

    **2.**     a sworn proof of loss with full particulars within 120 days of **Discovery**, including:

        **a.**     submission to examination under oath at the **Insurer's** request and provide a signed statement of answers; and

        **b.**     production of all pertinent records at such reasonable times and places as the **Insurer** shall designate; and

    **3.**     full and complete cooperation in all matters pertaining to a **Loss** or claim, including the investigation and settlement thereof.

**C.**     If an **Insured Organization** establishes wholly apart from its inventory records that it has a covered **Loss** caused by an identified **Employee**, then it may offer a comparison between its inventory records and a physical count of its inventory to prove the amount of such **Loss**.

**D.**     No **Insured** shall institute legal proceedings against the **Insurer** regarding any **Loss**:

    **1.**     more than two (2) years after **Discovery**; or

    **2.**     to recover a judgment or settlement against it or its bank resulting from **Forgery** or **Alteration,** or defense costs as specified in Section 7 Defense Costs Coverage (Forgery or Alteration), more than two (2) years after the date such judgment shall become final or settlement was entered.

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## KIDNAP, RANSOM & EXTORTION COVERAGE PART

It is agreed that the following Kidnap, Ransom & Extortion Coverage Part is added to the Policy:

# DECLARATIONS

**Insuring Agreements F. Repatriation Costs and G. Recall Costs are included only if designated with an X.**

| Insuring Agreement | Limit of Liability | Deductible | | Options |
|---|---|---|---|---|
| A.  Kidnap, Ransom & Extortion | $1,000,000 | $0 | X | F.  Repatriation Costs Coverage |
| B.  Custody | $1,000,000 | $0 | | Limit of Liability: |
| C.  Claims Costs | $1,000,000 | $0 | | $500,000 |
| D.  Response Costs | $1,000,000 | $0 | | Deductible: |
|    1.  R&R Sublimit | $25,000 | $0 | | $0 |
| | | | X | G.  Recall Costs Coverage - |
| E.  Personal Injury | | | | Limit of Liability: |
| Benefits: | | | | $500,000 |
|    1.  Death: | $500,000 | $0 | | Deductible: |
|    2.  Mutilation: | $500,000 | $0 | | $0 |
|    3.  Other Injury | $500,000 | $0 | | |

Security Consultant: Control Risks Group
United States: 1-800-831-1985
Global:  +44 20 7939 8900

## TABLE OF CONTENTS

1. **INSURING AGREEMENTS**
2. **DEFINITIONS**
3. **EXCLUSIONS**
4. **LIMITS OF LIABILITY**
5. **BENEFIT PAYMENTS**
6. **CALCULATION OF LOSS**
7. **LOSS REPORTING RIGHTS AND DUTIES**
8. **LOSS COOPERATION**
9. **CONFIDENTIALITY**

1. **INSURING AGREEMENTS**

   A. **Kidnap, Ransom & Extortion**

   The **Insurer** shall reimburse **Loss** paid to the perpetrators of any **Kidnapping** or **Extortion** first commenced during the **Policy Period**.

**B.** **Custody**

The **Insurer** shall reimburse **Loss** resulting from any destruction, disappearance, confiscation or theft of money, property or other consideration to the extent that such money, property or other consideration was:

**1.** intended as payment to the perpetrators of any **Kidnapping** or **Extortion** first commenced during the **Policy Period**; and

**2.** being held or conveyed by a person authorized by an **Insured Organization** to make such payment.

**C.** **Claims Costs**

The **Insurer** shall reimburse **Claim Costs** resulting from any **Kidnapping**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention** first commenced during the **Policy Period**.

**D.** **Response Costs**

The **Insurer** shall reimburse **Response Costs** resulting from any **Kidnapping**, **Extortion**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention** first commenced during the **Policy Period**.

**E.** **Personal Injury Benefits**

The **Insurer** shall pay the **Benefit** for any **Personal Injury** resulting from any **Kidnapping**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention** first commenced during the **Policy Period**.

**F.** **Repatriation Costs**

If Repatriation Costs coverage is elected in the Declarations of this Coverage Part, the **Insurer** shall reimburse **Repatriation Costs** arising from any **Repatriation** first commenced during the **Policy Period**.

**G.** **Recall Costs**

If Recall Costs coverage is elected in the Declarations of this Coverage Part, the **Insurer** shall reimburse **Recall Costs** arising from any **Extortion** to **Contaminate Products** first commenced during the **Policy Period**.

**2.** **DEFINITIONS**

Whether used in the singular or plural, the following terms shall have the meanings specified below:

**A.** **"Amputation"** means permanent total loss of function of any:

**1.** foot;

**2.** hand; or

**3.** thumb and index finger.

B. **"Assault"** means bodily harm to any **Insured Person**.

C. **"Benefit"** means the applicable scheduled benefit specified in the Declarations of this Coverage Part under Personal Injury Benefits.

D. **"Blindness"** means legal blindness involving permanent loss of sight in one or both eyes.

E **"Claim Costs"** means:

    **1.** reasonable and necessary defense costs incurred by an **Insured Organization**; and

    **2.** damages, judgments and settlements that an **Insured Organization** becomes legally obligated to pay,

    arising from a lawsuit brought against any **Insured Organization** or **Employee** by or on behalf of an **Insured Person** alleging negligence regarding victim retrieval operations involving, negotiations relating to, or prevention of, any **Kidnapping**, **Assault**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention**.

F. **"Compensation"** means all compensation paid by any **Insured Organization** to an **Employee**, including, without limitation, salary, bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

G. **"Computer System"** means any computer or computer network utilized by an **Insured Organization**, including any input, processing, storage, communication facilities, and off-line media libraries.

H. **"Computer Attack"** means any:

    **1.** entry into, or deletion of data from, a **Computer System**;

    **2.** change to data elements or program logic kept in machine readable format in a **Computer System**; or

    **3.** introduction of instructions that propagate throughout a **Computer System**;

    provided that such occurrence is directed solely against, and is not authorized by, any **Insured Organization**.

I. **"Contaminate"** means to introduce any foreign substance into or upon any **Property** that renders such **Property** unfit for use or sale.

J. **"Deafness/Muteness"** means permanent total loss of hearing and/or speech.

K. **"Death"** means:

    **1.** death, including clinical death, as determined by a medical examiner or similar governmental official; or

    **2.**    absence of communication from an Insured Person or the perpetrators of the Kidnapping, Hijacking, or Wrongful Detention of such Insured Person for a period of 2 years following the later of:

        **a.**    such **Kidnapping**, **Hijacking**, or **Wrongful Detention**;

        **b.**    the last communication from such **Insured Person**; or

        **c.**    the last communication from the perpetrators of such **Kidnapping**, **Hijacking**, or **Wrongful Detention**.

**L.**    **"Discovery"** means knowledge acquired by an **Executive** that would cause a reasonable person to believe (i) a covered **Loss** has occurred or (ii) that circumstances have arisen that may subsequently result in a covered **Loss**, including **Loss**:

    **1.**    sustained prior to the inception date specified in Item 2 of the Declarations for this Policy; or

    **2.**    for which exact details are unknown.

**M.**    **"Domicile Country"** means:

    **1.**    regarding **Repatriation**, a country in which an **Insured Person** is a citizen or legal resident; or

    **2.**    regarding **Wrongful Detention**, a country in which: (i) an **Insured Person** is a citizen or legal resident; or (ii) any **Insured Organization** is headquartered.

**N.**    **"Employee"** means any natural person whose labor or service is engaged and directed by any **Insured Organization**, including any: (i) **Executive**; (ii) fulltime, part-time, seasonal, leased and temporary employees; and (iii) volunteers.  **Employee** shall not include any **Independent Contractor**.

**O.**    **"Executive"** means any natural person who is a duly elected or appointed:

    **1.**    director, officer, or member of the board of managers or management committee of an **Insured Organization**;

    **2.**    in-house general counsel of an **Insured Organization**; or

    **3.**    manager of an **Insured Organization** organized outside the United States of America if such manager holds a position equivalent to those specified in 1 or 2 above.

**P.**    **"Extortion"** means any credible threat to:

    **1.**    commit a **Kidnapping**, **Assault**, **Hijacking**, or **Wrongful Detention**;

    **2.**    damage, destroy or Contaminate any Property;

    **3.**    improperly disclose or utilize any trade secrets or other proprietary information of any **Insured Organization** provided that such **Insured Organization** makes all reasonable efforts to protect such information from unauthorized disclosure;

**4.** distribute counterfeit **Products** or disseminate negative information regarding **Products**; or

**5.** initiate a **Computer Attack**,

in which a demand is made for payment as a condition for the avoidance or mitigation of such threat.

**Q.** **"Hijacking"** means any unlawful detention of an **Insured Person**, other than a **Kidnapping**, for a period in excess of 4 hours, while traveling in or on a vehicle, watercraft or aircraft.

**R.** **"Host Country"** means a country in which an **Insured Person** temporarily resides.

**S.** **"Insured"** means any:

**1.** **Insured Organization**; or

**2.** **Insured Person**.

**T.** **"Insured Person"** means any natural person:

**1.** who is an **Employee**;

**2.** spouse, domestic partner, sibling (including step, half, foster, adopted or in-law), ancestor or spouse's ancestor ("ancestor" includes adoptive parents and stepparents), niece, nephew, aunt, uncle, or lineal descendant or lineal descendant's spouse of an **Employee** ("lineal descendant" includes adopted, foster and step-children);

**3.** employed in the household of an **Employee** while in such **Employee's** home;

**4.** who is a normal resident or guest in an **Employee's** home;

**5.** customer or guest of an **Insured Organization** while on the **Premises** or in an **Employee's** home;

**6.** customer or guest of an **Insured Organization** while traveling with an **Employee**; or

**7.** retained by any **Insured** or independent security consultant to deliver a ransom or extortion payment.

**U.** **"Kidnapping"** means any wrongful abduction, and holding under duress or by fraudulent means, of an **Insured Person** in which a demand for payment of ransom is made as a condition for the release of such **Insured Person**.

**V.** **"Loss"** means direct loss sustained by any **Insured Organization**.   Regarding Insuring Agreement C, **"Loss"** means **Claim Costs**.   Regarding Insuring Agreement D, **"Loss"** means **Response Costs**.   Regarding Insuring Agreement E, **"Loss"** means **Benefit**. Regarding Insuring Agreement F, **"Loss"** means **Repatriation Costs**.  Regarding Insuring Agreement G, **"Loss"** means **Recall Costs**.

If **Kidnapping** or **Extortion** demands are made directly against an **Insured Person**, **"Loss"** also means:

**1.** ransom or extortion payments;

    **2.**    money, property, and other consideration that was intended to be used as ransom or extortion payments; and

    **3.**    **Response Costs**,

made or incurred by such **Insured Person** if the **Named Organization** provides written notice to the **Insurer** directing the **Insurer** to consider such amounts as covered **Loss** under this Coverage Part.

**W.**    **"Mutilation"** means permanent total loss of an entire:

    **1.**    ear;

    **2.**    nose;

    **3.**    finger;

    **4.**    toe; or

    **5.**    genital organ.

**X.**    **"Personal Injury"** means **Death**, **Amputation**, **Blindness**, **Deafness/Muteness** or **Mutilation** of an **Insured Person** that:

    **1.**    arises from a **Kidnapping**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention**;

    **2.**    is sudden and unexpected by such **Insured Person**;

    **3.**    is not related to any illness, disease or other bodily malfunction of such **Insured Person**; and

    **4.**    arises from a source external to such **Insured Person**.

**Y.**    **"Political Intimidation"** means any threat to do bodily harm to any **Insured Person** by a person or group acting, or purporting to act:

    **1.**    on behalf, or with the implied approval, of any government or governmental entity; or

    **2.**    on behalf of any political terrorist or insurgent party, organization or group.

**Z.**    **"Premises"** means buildings, facilities or properties occupied by an **Insured Organization** in conducting its business.

**AA.**    **"Property"** means all **Premises**, **Products**, and any other real or tangible personal property owned by or leased by the **Insured Organization** or for which the **Insured Organization** is legally liable.

**BB.**    **"Products"** means any raw materials, work in progress, inventory or products stored, manufactured or distributed by an **Insured Organization**.

**CC.**    **"R&R Costs"** means reasonable expenses of rest and rehabilitation for up to 30 days, including meals and recreation, for an **Insured Person** who has experienced a **Kidnapping** provided that such expenses are incurred within 12 months following such **Insured Person's** release.

DD. **"Recall Costs"** means any reasonable and necessary transportation expenses incurred by an **Insured Organization** in the withdrawal, physical inspection or destruction of **Products** that are necessitated by an **Extortion** to **Contaminate** such **Products**.

**"Recall Costs"** shall include any other expenses incurred with the prior written consent of the **Insurer**.

**"Recall Costs"** shall exclude:

1. refunds to customers for recalled **Products**; or

2. costs incurred for any known or suspected defect, deficiency or use of substandard or flawed materials necessitating the recall of **Products**.

EE. **"Repatriation"** means the departure of any **Insured Person** from a **Host Country** because of any:

1. nonmedical recommendation issued by a government official of a **Domicile Country** or **Host Country** that any category of persons that includes the **Insured Person** should leave a **Host Country**;

2. expulsion of an **Insured Person** by the recognized government of a **Host Country**, or the issuance of a written expulsion order or declaration of persona non grata regarding an **Insured Person** by the recognized government of a **Host Country**; or

3. wholesale confiscation or expropriation of the property, plant and equipment of an **Insured Organization** within a **Host Country**.

FF. **"Repatriation Costs"** means the following reasonable and necessary expenses incurred by an **Insured Organization** because of a **Repatriation**:

1. travel expenses to the nearest place of safety or to a **Domicile Country**;

2. lodging expenses up to a maximum of 7 days; and

3. **Compensation** for an **Employee** who is the subject of an **Repatriation**; provided that such coverage shall apply to the **Compensation** in effect at the time of the **Repatriation** and shall end upon the earlier of: (i) 120 days from the beginning of the **Repatriation**; or (ii) the return of the **Employee** to the **Domicile Country**.

**Repatriation Costs** exclude expenses incurred because of any:

1. violation of the laws any **Host Country**;

2. failure to comply with immigration, employment, residence or visa requirements;

3. debt, insolvency, commercial failure, repossession of any property by a title holder, or any other financial cause;

4. failure to honor any contractual obligation or bond or to obey any conditions in a license;

5. natural disasters, including, without limitation, any earthquake, flood, fire, famine, volcanic eruption or windstorm; or

6. ionizing radiations or contamination by radioactivity from any irradiated nuclear fuel or

form any nuclear waste, or the radioactive, toxic, explosive or other hazardous properties of any nuclear assembly or nuclear component thereof.

**GG.** **"Response Costs"** means the following reasonable and necessary expenses:

1. regarding any **Kidnapping**, **Extortion**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention**:

   a. security consulting by the security consultant scheduled in the Declarations for this Coverage Part;

   b. independent public relations consulting;

   c. travel and lodging expenses of an **Insured Person;**

   d. independent legal counsel;

   e. independent security guard services up to a maximum of 15 days;

   f. independent negotiation services;

   g. foreign language interpretation services;

   h. advertising, communications, and recording equipment;

   i. independent forensic analysis;

   j. interest on a loan to finance a ransom payment covered under Insuring Agreement A;

   k. reward paid to a natural person who provides information leading to the arrest and conviction of the perpetrators of any **Kidnapping**, **Extortion**, **Hijacking**, or **Wrongful Detention**;

   l. **Compensation** paid to any:

      1. kidnapped, confined, or hijacked **Employee** following the **Kidnapping**, **Hijacking**, or **Wrongful Detention** of such **Employee**; and

      2. replacement **Employee** following the **Kidnapping**, **Hijacking**, or **Wrongful Detention** of another **Employee**,

      provided that coverage of such **Compensation** to each **Employee** shall be no greater than the rate in effect for the kidnapped, confined, or hijacked **Employee** at the time of such **Kidnapping**, **Hijacking**, or **Wrongful Detention** and will end on the earliest of the following occurrences: (i) recovery of the deceased body of the kidnapped, confined, or hijacked **Employee**; (ii) 45 days after release of the kidnapped, confined, or hijacked **Employee**; (iii) 120 days after the last communication from the kidnapped, confined, or hijacked **Employee** or the perpetrators of the **Kidnapping**, **Hijacking**, or **Wrongful Detention**; or (iv) 5 years after the date of the **Kidnapping**, **Hijacking**, or **Wrongful Detention**;

**m.** personal financial loss incurred by an **Insured Person** resulting from such **Insured Person's** inability to attend to personal financial matters;

**n.** reasonable medical, cosmetic, psychiatric and dental expenses incurred following such **Insured Person's** release;

**o.** **R&R Costs**; and

**p.** travel expenses to return an **Insured Person** to the place where such **Insured Person** resided at the time of a **Kidnapping**, **Hijacking**, or **Wrongful Detention**; and

**2.** other expenses incurred with the prior written consent of the **Insurer**.

"**Response Costs**" shall not include **Claim Costs**, **Recall Costs**, or **Repatriation Costs**.

**HH.** "**Wrongful Detention**" means wrongful involuntary confinement of an **Insured Person** by others, other than a **Kidnapping**, for a period of 24 hours or more.

**3.** **EXCLUSIONS**

**A.** The **Insurer** shall not be liable to pay **Loss** resulting from any:

**1.** fraudulent, dishonest or criminal act of an identifiable **Employee**, acting alone or in collusion with others, provided that this exclusion shall not apply if such **Loss** exceeds the amount available to the **Insureds**, whether collectible or not, under any other bond, insurance or indemnity covering such **Loss**, in which case this Coverage Part shall cover only such excess amount;

**2.** fraud by an **Insured Person** allegedly the subject of a **Kidnapping**, **Extortion**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention** if, prior to payment, an **Insured Organization** had not made reasonable efforts to verify the authenticity of such **Kidnapping**, **Extortion**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention**; or

**3.** unrealized income, including, without limitation, loss of interest and dividends;

**4.** **Political Intimidation** or **Wrongful Detention** caused by:

**a.** any criminal law violation by an **Insured Person** if the **Domicile Country** of such **Insured Person** has a similar criminal law, provided that this exclusion shall not apply if it is determined by the **Named Organization** that a criminal law violation allegation is fraudulent and politically motivated; or

**b.** failure to comply with immigration, employment, residence or visa requirements;

**5.** **Loss** sustained by one **Insured** to the advantage of any other **Insured**; or

**6.** participation in political activities or military operations.

**B.** Regarding Insuring Agreement A, the **Insurer** shall not be liable to pay **Loss** unless surrendered to the perpetrators of a **Kidnapping** or **Extortion**.

**C.** Regarding Insuring Agreements B, C, D, E, F, and G, the **Insurer** shall not be liable to pay **Loss** resulting from any money, property or other consideration surrendered as a ransom or extortion payment and covered under Insuring Agreement A.

**D.** Regarding Insuring Agreement B and D, the **Insurer** shall not be liable to pay **Loss** resulting from confiscation by any government or governmental entity.

**E.** Regarding Insuring Agreements E, the **Insurer** shall not be liable to pay **Loss** resulting from any fraud by an **Insured Person** allegedly the subject of a **Personal Injury**.

## 4. LIMITS OF LIABILITY

**A.** The **Insurer's** maximum liability for each single **Loss** under each Insuring Agreement shall not exceed the applicable Limit of Liability specified in the Declarations of this Coverage Part, regardless of the number of **Insureds** incurring such **Loss**.

**B.** The R&R Sublimit is part of, and not in addition to, the Response Costs Limit of Liability. Such Sublimit shall be the **Insurer's** maximum liability for each single **Loss** regarding **R&R Costs**.

**C.** If an **Insured Person** incurs multiple **Personal Injuries**, the **Insurer's** maximum liability for all such **Personal Injuries** combined shall not exceed the **Death** benefit specified in the Declarations of this Coverage Part.

**D.** If more than one **Insured Person** incurs a **Personal Injury** resulting from a single **Kidnapping**, **Extortion**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention** or any series of **related Kidnappings**, **Extortions**, **Hijackings**, **Political Intimidations**, or Wrongful Detentions, all such **Personal Injuries** combined shall be considered a single Loss and the **Insurer's** maximum liability for all such **Personal Injuries** combined shall not exceed the **Death** benefit specified in the Declarations of this Coverage Part.

**E.** The following occurrences shall also be considered a single **Loss**:

**1.** regarding Insuring Agreement A, all **Loss** arising from any single **Kidnapping** or **Extortion** or any series of related **Kidnappings** or Extortions;

**2.** regarding Insuring Agreement B, all **Loss** arising from any single **Kidnapping** or **Extortion** or any series of related **Kidnappings** or Extortions;

**3.** regarding Insuring Agreement C, all **Claim Costs** arising from any single **Kidnapping** or **Extortion** or any series of related **Kidnappings** or **Extortions**;

**4.** regarding Insuring Agreement D, all **Response Costs** arising from any single **Kidnapping**, **Extortion**, **Hijacking**, **Political Intimidation**, or **Wrongful Detention**, or any series of related **Kidnappings**, **Extortions**, **Hijackings**, **Political Intimidations**, or **Wrongful Detentions**;

**5.** regarding Insuring Agreement F, all **Repatriation Costs** arising from any single **Repatriation** or any series of related **Repatriations**; and

      **6.**     regarding Insuring Agreement G, all **Recall Costs** arising from any single **Extortion** to **Contaminate Products** or any series of related **Extortions** to **Contaminate Products**.

**F.**     If there is more than one **Insured**, the maximum liability of the **Insurer** for any single **Loss** sustained by more than one **Insured** shall not exceed the amount for which the **Insurer** would have been liable if the single **Loss** had been sustained by one **Insured**.

**G.**     The amount that the **Insurer** shall pay for any single **Loss** shall not be cumulative from **Policy Period** to **Policy Period**.

**H.**     Unless specified in the Declarations for this Coverage Part, there is no Deductible applicable to any **Loss** covered under this Coverage Part.

## 5.    BENEFIT PAYMENTS

The **Benefit** for **Death** will be paid to an **Insured Person's** estate. The **Benefit** for all other **Personal Injury** will be paid to an **Insured Person**, unless otherwise directed by the **Insured Person**.

## 6.    CALCULATION OF LOSS

**A.**     For **Loss** of Securities, the **Insurer** shall pay the lesser of either:

      **1.**     the actual market value of lost, damaged or destroyed Securities, but only up to and including their value at the close of business on the business day immediately preceding the **Discovery** of such **Loss**;

      **2.**     the cost of replacing Securities; or

      **3.**     the cost to post a Lost Securities Bond in connection with issuing duplicates of the Securities.

**B.**     For **Loss** of books of account or other records, the **Insurer** shall pay the cost of blank books, pages or tapes or other blank materials to replace lost or damaged books of account or other records.

**C.**     For **Loss** of **Property**, the **Insurer** shall pay the lesser of either:

      **1.**     the price paid by an **Insured** for the **Property**; or

      **2.**     the cost to repair or replace **Property** with that of like kind, quality and value at the time that the **Named Organization** furnishes a proof of loss pursuant to Section 8. Loss Reporting Rights and Duties.

**D.**     For **Loss** of foreign currency, the **Insurer** shall pay the United States of America dollar equivalent of foreign currency determined by the rate of exchange on the date of **Discovery** of such **Loss**.

## 7.    LOSS REPORTING RIGHTS AND DUTIES

**A.**     Knowledge possessed by any **Insured** or **Discovery** shall be deemed knowledge possessed or **Discovery** by all **Insureds**.

**B.**     Upon **Discovery** and as a condition precedent to coverage, the **Named Organization** shall provide to the **Insurer**:

    **1.**    written notice of **Discovery** as soon as practicable, but no later than 60 days after the end of the **Policy Period**; and

    **2.**    a sworn proof of **Loss** with full particulars.

**C.**    No **Insured** shall institute legal proceedings against the **Insurer** regarding any **Loss** more than 2 years after **Discovery**.

## 8.   LOSS COOPERATION

The **Insureds** shall cooperate with the **Insurer** regarding the handling and processing of all covered matters under this Policy.  Regarding Insuring Agreement C, and without limiting the foregoing, the **Insureds** shall

**A.**    allow **Insurer** the right to associate in the handling of any matters that may result in **Claim Costs**; and

**B.**    not assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Claim Costs** without the prior written consent of the **Insurer**, which consent shall not be unreasonably withheld.  The **Insurer** shall not be liable for any **Claim Costs** to which it has not consented.

## 9.   CONFIDENTIALITY

The **Insureds** shall not disclose the existence of this insurance to any third party.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 1

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDMENTS TO GENERAL PROVISIONS (LOCKTON)**

Regarding the General Provisions, it is agreed that:

1. **APPLICATION – LIMITATION OF REMEDIES FOR MISREPRESENTATIONS OR OMISSIONS**

   Section 15. Application, A of this Policy shall be the **Insurer's** sole remedy with respect to misrepresentations or omissions in the **Application**.  This Policy shall not be rescinded in its entirety.

2. **CONTROLLED LIMITED PARTNERSHIP COVERAGE**

   **A.**   Section 2. Definitions, K. **"Insured Organization"** is amended to add:

   **"Insured Organization"** shall include any such organization in its capacity as a general partner of a **Controlled Limited Partnership**.

   **B.**   **"Controlled Limited Partnership"** means any limited partnership in which, and for as long as:

   **1.**   the **Named Organization** owns or controls, directly or indirectly, more than 50% of the limited partnership interests; and

   **2.**   any **Insured Organization** is the sole general partner,

   of such limited partnership.

   **C.**   Section 2. Definitions, U. **"Subsidiary"** is amended to add:

   **"Subsidiary"** also means a **Controlled Limited Partnership**.

3. **DUTY TO REPORT CLAIM UPON AWARENESS OF CEO, CFO, GC, AND RISK MANAGER ONLY**

   Section 9. Claim and Potential Claim Notices, A is deleted and replaced by:

   As a condition precedent to coverage, the **Insureds** shall give the **Insurer** written notice of any **Claim** as soon as practicable after the chief executive officer, chief financial officer, general counsel or risk manager of an **Insured Organization** first becomes aware of such **Claim**, but no later than 60 days after the end of the **Policy Period** or the Extended Reporting Period, if applicable.  Such notice shall specify the **Liability Coverage Part** under which notice is being given.

4. **NO SUBROGATION AGAINST INSUREDS – LIABILITY COVERAGE PARTS**

   Section 12. Subrogation is amended to add:

   Notwithstanding any other provision of this Policy, solely with respect to the **Liability Coverage Parts**, the **Insurer** shall not exercise its rights of subrogation against any **Insureds**.

5. **APPLICATION – LIMITATION ON IMPUTATION OF KNOWLEDGE TO CEO, COO, AND CFO**

Section 15. Application, B.2 is deleted and replaced by:

> the **Named Organization's** chief executive officer, chief operating officer and chief financial officer shall be imputed to all **Insureds** other than **Insured Persons**.

**6.    AMEND DEFINITION OF APPLICATION**

It is agreed that, Definitions, A. **"Application"** is deleted and replaced by:

**A.**    **"Application"** means the application for this Policy received within the last 12 months, including any information and materials submitted therewith or incorporated therein. **"Application"** also means any application received within the last 12 months, including any information and materials submitted therewith or incorporated therein, for any insurance policy in an uninterrupted series of policies issued by the **Insurer**, or any insurance company controlling, controlled by or under common control with the **Insurer**, of which this Policy is a direct or indirect renewal or replacement.  The **Application** shall be deemed attached to and is incorporated into this Policy.

**7.    AMEND ACQUISITION THRESHOLD – 35%**

It is agreed that the reference to "25%" in the second paragraph of General Provisions Section 14. Corporate Transactions, B. Acquisition or Creation of Subsidiary is deleted and replaced by "35%".

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 2

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**STATE AMENDATORY INCONSISTENCY
(GENERAL PROVISIONS)**

It is agreed that if there is an inconsistency in language between a state amendatory endorsement to this Policy and any provision of this Policy, the **Insurer** shall apply the language which is more favorable to the **Insureds** provided such application is permitted by law.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 3

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**INSURED RIGHT TO CONSENT TO SETTLEMENTS
(GENERAL PROVISIONS)**

It is agreed that General Provisions Section 8. Defense of Claims, D is deleted and replaced by:

The **Insurer** may, with the written consent of the **Insureds**, settle any **Claim** for a monetary amount that the **Insurer** deems reasonable.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 4

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**OTHER INSURANCE –
FUND POLICY
(GENERAL PROVISIONS)**

It is agreed that General Provisions Section 13 is deleted and replaced by:

**OTHER INSURANCE**

Coverage under this Policy shall apply only in excess of any other valid and collectible insurance or bond regardless of whether such other insurance or bond is stated to be excess, contributory, contingent or otherwise, unless such other insurance or bond is written specifically excess of this Policy by reference in such other insurance or bond to this Policy's Policy Number.

However, with respect to a management and professional liability insurance policy issued to a security holder of the **Insured Organization**, coverage under this Policy shall apply as primary insurance for **Loss** attributable to the **Wrongful Acts** of an **Executive**, without regard to any indemnification which may be owed to such **Executive** by such security holder.

Notwithstanding the above, in the event of a **Claim** against an **Insured** arising out of his or her service as a director, officer, trustee or governor of an **Outside Entity** this policy shall be specifically excess of any valid and collectible indemnification provided by such **Outside Entity** and any valid and collectible insurance provided to such **Outside Entity**.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 5

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**INSURED DUTY TO DEFEND - OPTION TO TENDER DEFENSE
(GENERAL PROVISIONS)**

Regarding the **Liability Coverage Parts** only, it is agreed that:

**1.**     General Provisions Section 8. Defense of Claims, A. and B. are deleted and replaced by:

    **A.**     It shall be the duty of the **Insureds** to defend any **Claim**.  The **Insurer** does not assume any duty to defend any **Claim**.  However, the **Named Organization** may, solely at such time as a **Claim** is reported to the **Insurer**, at its sole option tender the defense of a **Claim** for which coverage is provided under a **Liability Coverage Part**.  Regardless of whether the **Insurer** assumes the defense of such **Claim**, the Insurer shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this policy.  The **Insurer** may make any investigation it deems appropriate.

    **B.**     If the **Named Organization**:

        **1.**     tenders the defense of a **Claim** to the **Insurer**,  the **Insurer's** duty to defend such **Claim** shall end upon exhaustion of any applicable Limit of Liability.

        **2.**     does not tender the defense of a **Claim** to the **Insurer**,  the **Insurer** shall, at the written request of the **Insureds**, advance **Defense Costs** excess of the applicable Retention prior to the final disposition of any **Claim**.

    If any applicable Limit of Liability is exhausted, the premium for this Policy shall be fully earned.

**2.**     General Provisions Section 11. Allocation is deleted and replaced by:

    Regarding the **Liability Coverage Parts** only, if the **Insureds** incur **Loss** that is only partially covered by this Policy because a **Claim** includes both covered and uncovered matters or because a **Claim** is made against both covered and uncovered parties, **Loss** shall be allocated between covered **Loss** and non-covered loss based upon the relative legal exposure of all parties to such matters.

    However, notwithstanding the above, if the **Named Organization** tenders the defense of a **Claim** for which coverage is provided under this Policy, then coverage for such **Claim** shall apply as follows:

    **A.**     100% of **Defense Costs** shall be allocated to covered **Loss**; and

    **B.**     **Loss** other than **Defense Costs** shall be allocated between covered and non-covered **Loss** based upon the relative legal exposure of the parties to such matters.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 6

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NAMED CO-DEFENDANTS EXTENSION FOR
PRIVATE EQUITY AND VENTURE CAPITAL FIRMS**

**(GENERAL PROVISIONS)**

Regarding the General Provisions, it is agreed that:

1.   Section 4. Coverage Extensions, is amended to add:

**Named Co-Defendants Extension**

Coverage afforded under this Policy shall extend to the **Named Co-Defendants** to the extent that, and for as long as, a **Claim** is jointly made and continuously maintained against both an **Insured** and the **Named Co-Defendants**, provided that:

a.   coverage shall only be afforded for **Loss** for a **Wrongful Act** of an **Insured**;

b.   the **Named Co-Defendants** become co-defendants in such **Claim** by reason of their actual or alleged status as a controlling shareholder; and

c.   The **Insured** and the **Named Co-Defendants** are represented by the same legal counsel.

2.   Section 2. Definitions, is amended to add:

**"Named Co-Defendants"** means the **Sponsor Organization** or any **Affiliated Entity** or any directors, officers, general partners, managing directors or employees thereof.

**"Sponsor Organization"** means:

Falcon Investment Advisors, LLC

**"Affiliated Entity"** means any entity that is:

a.   A pooled investment vehicle created, managed or controlled by the **Sponsor Organization**;

b.   An investment or management company controlled by the **Sponsor Organization** that renders services to an **Affiliated Entity** in paragraph a. above; or

c.   A special purpose vehicle created and controlled by the **Sponsor Organization** for the purpose of making an acquisition of the **Named Organization**

3.   Any coverage afforded for a **Named-Codefendant** shall be on the same terms and conditions as apply to a **Claim** made against an **Insured**.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 7

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND COVERAGE PART COORDINATION PROVISION**

Regarding the General Provisions, it is agreed that Section 26. Coverage Part Coordination, A. is deleted and replaced by:

**A.**   If any **Loss** is covered under two or more **Liability Coverage Parts**:

**1.**   the **Insureds** shall be entitled to recover **Loss** only once; and

**2.**   the maximum aggregate amount that the **Insurer** shall pay for all **Loss** arising from a single **Claim** shall be the largest remaining applicable Limit of Liability, and, if elected, the remaining Defense Costs Outside the Limit of Liability amount.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 8

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDMENTS TO DIRECTORS, OFFICERS, & ORGANIZATION LIABILITY COVERAGE PART (LOCKTON)**

Regarding the Directors, Officers, & Organization Liability Coverage Part, it is agreed that:

1. **ARBITRATION, ADR, WELLS NOTICE, AND EXTRADITION COVERAGE**

    **A.**    Section 2. Definitions, A. **"Claim"** is deleted and replaced by:

        A.    **"Claim"** means any:

            1.    written demand or notice for civil monetary damages or other civil non-monetary relief commenced by the **Insured's** receipt of such demand or notice;

            2.    civil proceeding, including but not limited to any arbitration proceeding or other alternative dispute resolution (ADR) proceeding, commenced by the service upon the **Insured** of a complaint, demand for arbitration, or similar pleading;

            3.    a criminal proceeding commenced by the return of an indictment, information, or similar document;

            4.    formal civil, criminal, administrative, or regulatory proceeding commenced by the filing of a notice of charges or similar document, or by the entry of a formal order of investigation or similar document;

            5.    solely for purposes of Insuring Agreement D, any **Derivative Demand**;

            6.    written request to an **Insured** to toll or waive the statute of limitations regarding a potential **Claim** as described in 1 and 2 above commenced by the **Insured's** receipt of such request;

            7.    civil, criminal, administrative, or regulatory investigation of an **Insured Person** once such **Insured Person** is identified by name in a Wells Notice, subpoena or target letter by such investigating authority as a person against whom a proceeding described in 2, 3 or 4 above may be commenced; or

            8.    with respect to a criminal proceeding described in 3 above, official request for **Extradition**, including the execution of an arrest warrant where such execution is an element of the request for **Extradition**.

    **B.**    **"Extradition"** means the formal process by which an **Insured Person** is requested to be surrendered from his or her current country of employ and domicile to any other country for trial or to answer any criminal accusation.

2. **ADVISORY BOARD COVERAGE**

    Section 2. Definitions, E. **"Executive"** is amended to add:

        **"Executive"** also means any natural person who was, is or shall be a duly elected or appointed member of an advisory board of any **Insured Organization**, including, without limitation, a medical, scientific, or technology advisory board.

00 PCD0325 00 11 10                      Page 1 of 5

**3.**   **EMPLOYEE LAWYER COVERAGE**

Section 2. Definitions, E. **"Executive"**, 2 is deleted and replaced by:

> in-house general counsel of an **Insured Organization** as well as any other natural person employed by an **Insured Organization** as an in-house attorney; or

**4.**   **AMEND LOSS DEFINITION**

Section 2. Definitions, I. **Loss** is deleted and replaced by:

I.   **"Loss"** means the amount that the **Insureds** are legally obligated to pay resulting from a **Claim**, including, without limitation, damages, settlements, judgments, pre- and post-judgment interest, **Defense Costs**, and **Investigation Costs**.

**Loss** shall include punitive and exemplary damages and the multiple portion of any multiplied damage award where insurable by law.  The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

In determining such applicable jurisdiction, the **Insurer** shall consider, among other criteria, the jurisdiction where:

**1.**   the punitive damages were awarded;

**2.**   the act giving rise to the punitive damages award occurred;

**3.**   the **Insured** is incorporated or maintains its principal place of business; or

**4.**   the **Insurer** is incorporated or maintains its principal place of business.

**Loss** (other than **Defense Costs**) shall exclude any:

**1.**   taxes, fines or penalties imposed by law;

**2.**   matters that are uninsurable under the law pursuant to which this Policy shall be construed;

**3.**   amount for which the **Insureds** are not financially liable or for which the claimants are without legal recourse to the **Insureds**; or

**4.**   Non-monetary relief.

**5.**   **SECURITIES ACT SECTIONS 11 & 12 COVERAGE**

The **Insurer** shall not assert that any **Loss** incurred is uninsurable due to an actual or alleged violation of Sections 11 or 12 of the Securities Act of 1933.

**6.**   **PRIOR INSURANCE NOTICE – SIMILAR POLICIES**

Section 4. Exclusions, A.1 is deleted and replaced by:

> arising from, based upon, or attributable to any fact, circumstance or situation that, before the inception date of this Policy, was the subject of any notice given under any other directors and officers liability, management liability or similar insurance policy;

**7.**   **POLLUTION COVERAGE**

Section 4. Exclusions, A.4 is amended to delete and replace the language following paragraph b with:

provided that this exclusion shall not apply to any: (i) **Claim** involving the purchase or sale of securities of any **Insured Organization** or any interest in such securities; (ii) **Derivative Demand**; or (iii) **Derivative Suit**.;

**8.**   **FORMER EXECUTIVE CLAIM COVERAGE (NO SERVICE DURING PAST TWO YEARS)**

Section 4. Exclusions, A.6.e is amended by replacing the term "four years" wherever it appears with "two years".

**9.**   **BANKRUPTCY/INSOLVENCY CLAIM COVERAGE**

Section 4. Exclusions, A.6.f is deleted and replaced by:

brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver, creditors committee or similar official or committee for an **Insured Organization** or any assignee of such trustee, examiner, receiver, committee or similar official or committee if such **Claim** is made without the assistance, participation or solicitation of any **Executive**;

**10.**   **WHISTLEBLOWER COVERAGE**

For purposes of this Liability Coverage Part, the lawful provision of information or other assistance by an **Insured Person** to any investigation conducted by any:

**A.**   regulatory or legal enforcement agency;

**B.**   governmental legislative body or committee thereof;

**C.**   **Employee** with supervisory authority over the **Insured Person**; or

**D.**   **Employee** with authority to investigate corporate misconduct,

shall not be considered "solicitation, assistance or participation" to the extent that the **Insured Person** reasonably believes that the conduct being investigated constitutes a violation of any federal, state, local or foreign law.

**11.**   **PRIVATE PLACEMENT & FAILED IPO COVERAGE**

Section 4. Exclusions, A.9 is deleted and replaced by:

arising from, based upon, or attributable to any public offering of equity securities of an **Insured Organization** or the purchase or sale of such securities subsequent to such public offering; provided that this exclusion shall not apply to any **Claim**:

**a.**   for a **Wrongful Act** in an offering, sale, or purchase of equity securities in a transaction that is exempt from registration under the Securities Act of 1933;

**b.**   made by any security holders of an **Insured Organization** for the failure of the **Insured Organization** to undertake or complete an initial public offering of securities of such **Insured Organization**; or

**c.** for a misrepresentation in connection with the preparation for an initial public offering of securities of any **Insured Organization** that does not occur.

## 12. PERSONAL PROFIT EXCLUSION – FINAL ADJUDICATION

Section 4. Exclusions, A.10 is deleted and replaced by:

arising from, based upon, or attributable to the gaining of any personal profit, remuneration or advantage to which such **Insured** is not legally entitled if a final adjudication in such **Claim** establishes that such profit, remuneration or advantage occurred; or

## 13. CONDUCT EXCLUSIONS – IMPUTATION LIMITATIONS

Section 4. Exclusions, A is amended by replacing the paragraph following exclusion 11 with:

Regarding exclusions 10 and 11 above: (i) no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**; and (ii) only a **Wrongful Act** by a past, present or future chief executive officer, chief operating officer or chief financial officer of any **Insured Organization** shall be imputed to an **Insured Organization**.

## 14. OMNIBUS PROFESSIONAL SERVICE EXCLUSION – SECURITIES CLAIM, DERIVATIVE DEMAND, & DERIVATIVE SUIT COVERAGE

**A.** Section 4. Exclusions, B.3 is deleted.

**B.** The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured** arising from, based upon, or attributable to any rendering of, or failure to render, any professional services for others, including, without limitation, services performed by the **Insureds** for or on behalf of a customer or client, provided that this exclusion shall not apply to any **Derivative Demand**, **Derivative Suit**, or any **Claim** involving the purchase or sale of securities of any **Insured Organization** or any interest in such securities.

## 15. INTELLECTUAL PROPERTY EXCLUSION EXCEPTIONS

Section 4. Exclusions, B.5 shall not apply to pay **Derivative Demand**, **Derivative Suit**, or any **Claim** involving the purchase or sale of securities of any **Insured Organization** or any interest in such securities.

## 16. WAGE AND HOUR EXCLUSION

The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured** arising from, based upon, or attributable to any unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, improper payroll deductions, improper employee classification, failure to maintain accurate time records, failure to grant meal and rest periods, or social security benefits, provided that this exclusion shall not apply to any: (i) **Claim** involving the purchase or sale of securities of any **Insured Organization** or any interest in such securities; (ii) **Derivative Demand**; or (iii) **Derivative Suit**.

## 17. ORDER OF PAYMENTS – BANKRUPTCY CLARIFICATION

Section 5. Priority of Non-Indemnifiable Loss Payments is deleted and replaced by:

**A.** In the event of **Loss** arising from one or more **Claim(s)** for which payment is due under the provisions of this Policy, then this Policy shall:

1.    first, pay such **Loss** for which coverage is provided under Insuring Agreement A of this Policy;

2.    second, only if and to the extent the payment under Insuring Agreement A does not exhaust the Limit of Liability, then pay such **Loss** for which coverage is provided under Insuring Agreement B of this Policy;

3.    third, only if and to the extent the payments under Insuring Agreements A and B do not exhaust the Limit of Liability, then pay such **Loss** for which coverage is provided under Insuring Agreement C of this Policy; and

4.    fourth, once all such **Loss** is paid, pursuant, first, to subsection (1), then subsection (2) and then, subsection (3) of this Section 5, the remaining Limits of Liability to the **Insured Organization's** then-current directors and officers, subject to all of the Policy's other terms and conditions.

**B.**    Nothing in this Clause shall be construed to increase the Limit of Liability of the **Insurer**. The Limit of Liability shall remain the maximum aggregate amount that the **Insurer** shall pay for all **Claims** under all Coverage Parts of this Policy combined.

**C.**    The bankruptcy or **Insolvency** of any **Insured** shall not diminish or otherwise affect the **Insurer's** obligation under this Policy.

**D.**    In the event that any **Insured** for any reason seeks any order, ruling or other determination from any court or other authority that amounts may be paid under this Policy notwithstanding the **Insolvency** of any **Insured Organization** or any other person or entity, then such amounts shall be considered **Defense Costs** within the meaning of this Policy.

## 18.    AMEND DEFINITION OF WRONGFUL ACT – DELETE "SOLELY"

Section 2. Definitions, L.2. is deleted and replaced by:

2.    matter claimed against an **Insured Person** by reason of their serving in such capacity, including in an **Outside Capacity**.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 9

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**OUTSIDE CAPACITY EXCLUSION – PRIVATE EQUITY CLARIFICATION
(D&O)**

It is agreed that Directors, Officers, & Organization Liability Coverage Part, Section 4. Exclusions, A.7 is deleted and replaced by:

7.    arising from, based upon, or attributable to any **Insured Person** serving as a director, officer, trustee, regent, governor or equivalent executive or as an employee of any entity other than an **Insured Organization** even if such service is at the direction or request of the **Insured Organization**, provided that this exclusion shall not apply to:

   a.    any **Claim** for a **Wrongful Act** by an **Insured Person** in an **Outside Capacity**; or

   b.    that portion of **Loss** for any **Claim** for **Wrongful Acts** of an **Executive** who is serving as a director or equivalent position of an **Insured Organization** at the direction of a **Private Equity Sponsor** but only to the extent that such **Claim** is made against such **Executive** for **Wrongful Acts** both in his or her capacity as an **Executive** of an **Insured Organization** and in his or her capacity as a director, officer, trustee, regent, governor or equivalent position or as an employee of a **Private Equity Sponsor**.

   Solely for the purpose of this endorsement, **"Private Equity Sponsor"** shall mean:

   Falcon Investment Advisors, LLC; Knox Lawrence International, LLC

All other terms and conditions of this policy remain unchanged.

Endorsement Number: 10

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ANTITRUST EXCLUSION – DEFENSE COSTS SUBLIMIT
(D&O COVERAGE PART)**

Regarding the Directors, Officers, & Organization Liability Coverage Part, it is agreed that:

**1.**    Section 4. Exclusions, B.6 is deleted.

**2.**    The **Insurer** shall not pay **Loss** for any **Antitrust Claim** against an **Insured**.

**3.**    **"Antitrust Claim"** means any **Claim** arising from, based upon, or attributable to any price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, Sherman Anti-Trust Act, Clayton Act, or any similar law regulating anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, regardless of whether such **Claim** also includes other non-antitrust allegations.

**4.**    General Provision Section 11. Allocation shall not apply to any **Antitrust Claim**.

**5.**    Notwithstanding the above, the **Insurer** shall provide **Defense Costs** for an **Antitrust Claim** provided that such coverage shall be subject to the following:

**A.**    The **Insurer's** maximum liability for all **Defense Costs** shall be a Sublimit of Liability of $1,000,000.  Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under this coverage.  Such Sublimit of Liability shall be part of, and not in addition to, the limit of liability applicable to this **Liability Coverage Part**.

**B.**    It shall be the duty of the **Insureds** to defend any **Antitrust Claim**.

**C.**    The **Insurer** shall not have any duty to defend any **Antitrust Claim**, provided that the **Insurer** shall have the right to:

**1.**    associate with the **Insureds** in the defense of any **Antitrust Claim**; and

**2.**    make any investigation it deems appropriate.

**D.**    At the written request of the **Insureds**, the **Insurer** shall advance **Defense Costs** excess of the applicable Retention prior to the final disposition of any **Antitrust Claim**, provided that the **Insureds** shall repay such **Defense Costs** if it is subsequently determined that such **Defense Costs** are not covered under this Policy.

**E.**    The **Insureds** shall not admit nor incur any **Defense Costs** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld.  The **Insurer** shall not be liable for any **Defense Costs** to which it has not consented.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 11

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

00 PCD0189 00 09 09

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CRISIS MANAGEMENT EXPENSES FOR NETWORK SECURITY BREACH
(D&O LIABILITY COVERAGE PART)**

Regarding the Directors, Officers, & Organization Liability Coverage Part, it is agreed that:

**1.**     Section 1. Insuring Agreements is amended to add:

> The **Insurer** shall pay **Crisis Management Expenses** on behalf of an **Insured Organization** resulting from a **Network Security Breach** or **Privacy Violation** occurring during the **Policy Period**.
>
> The **Insurer's** maximum liability for all **Crisis Management Expenses** shall be a Sublimit of Liability of $25,000.  Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under this Insuring Agreement.  Such Sublimit of Liability shall be part of, and not in addition to, the limit of liability applicable to this **Liability Coverage Part**.  No Deductible shall apply to this Insuring Agreement.

**2.**     Section 2. Definitions is amended to add:

**A.**     **"Computer System"** means any computer hardware, software or firmware, and components thereof including data stored thereon, that is owned or leased by an **Insured Organization**, and is under the direct operational control of an **Insured Organization**; provided that **Computer System** does not include any disconnected devices including, but not limited to, laptops, mobile devices or memory storage data devices.

**B.**     **"Crisis Management Expenses"** means reasonable and necessary fees and expenses incurred by an **Insured**, with the **Insurer's** prior written consent, for:

**1.**     public relations firm services to mitigate reputational damage resulting from any **Network Security Breach** or **Privacy Violation**; and

**2.**     legal services (by an attorney selected from the **Insurer's** panel of lawyers) regarding any **Network Security Breach** or **Privacy Violation** to:

**a.**     provide counsel on the obligations of any applicable **Privacy Law**; and

**b.**     draft notices required by any applicable **Privacy Law**.

**Crisis Management Expenses** shall exclude any: (i) compensation, internal expenses or overhead of any **Insured**; or (ii) payments made as compensation for any injury or damages resulting from any **Network Security Breach** or **Privacy Violation**.

**C.**     **"Malicious Code"** means any virus, Trojan, worm or other similar malicious software program, code or script designed to infect, harm, harm data on, or steal data from, a computer system.

**D.**     **"Network Security Breach"** means any:

**1.**     unauthorized access to, or unauthorized use of, a **Computer System**; or

**2.**     transmission of **Malicious Code** into or from a **Computer System**.

**E.**     **"Privacy Violation"** means any:

      **1.**     theft or unauthorized copying of **Private Information** while in the care, custody or control of an **Insured**; or

      **2.**     violation of a **Privacy Law** by an **Insured**.

**F.**    **"Privacy Law"** means those parts of the following laws regulating the use and protection of non-public personal information:

      **1.**     Health Insurance Portability and Accountability Act of 1996 (HIPAA);

      **2.**     Gramm-Leach Bliley Act of 1999 (GLBA);

      **3.**     consumer protection and unfair and deceptive trade practice laws enforced by state Attorneys General or the Federal Trade Commission, including, without limitation, Section 5(a) of the FTC Act 15;

      **4.**     security breach notification laws that require notice to individuals of the actual or potential theft of their non-public personal information, including, without limitation, the California Security Breach Notification Act of 2003 (CA SB 1386); or

      **5.**     domestic or foreign privacy laws requiring reasonable security for non-public personal information or the adoption of a privacy policy limiting the sale, disclosure or sharing of non-public personal information.

**G.**    **"Private Information"** means any:

      **1.**     individual's name in combination with any of the following:

           **a.**     social security number;

           **b.**     drivers license number or any other state identification number;

           **c.**     medical or healthcare data, including protected health information; or

      **2.**     non-public personal information as defined in any **Privacy Law**; or

      **3.**     confidential or proprietary business information of a third-party that is protected under a written non-disclosure agreement between such third-party and an **Insured Organization**.

**3.**    Regarding the coverage provided under this Endorsement, General Provisions Sections 4. Coverage Extensions, 5. Extended Reporting Period, 7. Deductible, 8. Defense of Claims, 9. Claim and Potential Claim Notices, 10. Interrelated Claims, and 11. Allocation shall not apply.

**4.**    Regarding the coverage provided under this Endorsement, the **Insureds** shall give to the **Insurer** all information and cooperation as the **Insurer** may reasonably request.

**5.**    Regarding the coverage provided under this Endorsement and as a condition precedent to coverage, the **Insureds** shall give to the **Insurer** written notice of any **Network Security Breach** or **Privacy Violation** for which **Crisis Management Expenses** coverage is requested. Such notice shall be given as soon as practicable provided that such notice shall be no later than 60 days after the end of the **Policy Period**.

**6.**    Regarding the coverage provided under this Endorsement, Section 4. Exclusions shall not apply.

**7.**   Regarding the coverage provided under this Endorsement, section 2. Definitions, I. "Loss" is amended to add:

> **"Loss"** shall include **Crisis Management Expenses**.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 12

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ADDITIONAL LIMIT OF LIABILITY – $1,000,000 (SAME CLAIM)
## (D&O LIABILITY COVERAGE PART)

Regarding the Directors, Officers, & Organization Liability Coverage Part, it is agreed that:

**A.**   Item 6. of the Declarations, Directors, Officers, & Organization Liability Coverage Part, Options, the amount of $500,000 is deleted and replaced with $1,000,000.

**B.**   Section 6. Additional Limit of Liability is deleted and replaced by:

**6.   ADDITIONAL LIMIT OF LIABILITY**

**A.**   If an additional $1,000,000 Limit of Liability for **Claims** against **Insured Persons** ("Additional Limit of Liability") is elected in Item 6 of the Declarations, then an Additional Limit of Liability of $1,000,000 shall be available to pay **Non-Indemnifiable Loss** covered under Insuring Agreement A.

**B.**   Any Additional Limit of Liability shall be in addition to, and not part of, the Limit of Liability otherwise applicable to this **Liability Coverage Part** as specified in Item 6 of the Declarations.

**C.**   Any Additional Limit of Liability shall be excess of any valid and collectible insurance that is specifically excess of this Policy.  Such excess insurance must be exhausted by the payment of loss covered thereunder before the **Insurer** shall be liable to pay the Additional Limit of Liability.

**D.**   **Non-Indemnifiable Loss** covered under Insuring Agreement A shall be allocated between, and paid by the **Insurer** under, the applicable Limit of Liability specified in Item 6 of the Declarations and any Additional Limit of Liability in whatever portions will maximize the total amount of covered **Loss** being paid under this Policy.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 13

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ARCH CANOPY PREMIER<sup>SM</sup> WITH CONTINUITY PROTECTION EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**

Regarding the Employment Practices Liability Coverage Part, it is agreed that:

**1.   CLAIM DEFINITION**

Section 2. Definitions, B. "Claim" is deleted and replaced by:

**"Claim"** means any:

**1.**   written demand for monetary damages or non-monetary relief commenced by the receipt by any **Insured** of such demand;

**2.**   civil proceeding, including, without limitation, a lawsuit, arbitration or alternative dispute resolution proceeding, commenced by the receipt by, or service upon, any **Insured** of a complaint, demand for arbitration, request for mediation, or similar document;

**3.**   administrative or regulatory proceeding, including, without limitation, any proceeding before the Equal Employment Opportunity Commission, any state or local fair employment practices agency, or the Office of Federal Contract Compliance Programs, commenced by the receipt by, or service upon, any **Insured** of an **EEOC Charge**, notice of charges, order to show cause or similar document;

**4.**   administrative or regulatory investigation of any **Insured** commenced by the receipt by, or service upon, any **Insured** of a formal investigative order; or

**5.**   written request to an **Insured** to toll or waive a period or statute of limitations regarding a potential **Claim** as described above commenced by the receipt by any **Insured** of such request.

Notwithstanding the above, **Claim** excludes any: (i) criminal proceeding or investigation; (ii) labor or grievance proceeding initiated pursuant to a collective-bargaining agreement; or (iii) audit by the Office of Federal Contract Compliance Programs.

**2.   CONTINUITY PROTECTION COVERAGE**

**A.**   **"Related Claim"** means each **Claim** for the same **Wrongful Act** or any **Interrelated Wrongful Acts**.

**B.**   Notwithstanding General Provisions Section 10. Interrelated Claims, A, if a **Prior EPL Policy** is listed in this endorsement and a **Claim** for a **Wrongful Act** as specified in Section 2. Definitions, K "Wrongful Act", 1 that is an **EEOC Charge** or **Written Demand** was commenced during the policy period of such **Prior EPL Policy** and notice of such **EEOC Charge** or **Written Demand** was not given under such **Prior EPL Policy**, then:

a.   such **EEOC Charge** or **Written Demand**; and

b.   any **Related Claim** commenced during the **Policy Period** that is a: (i) civil lawsuit, arbitration or alternative dispute resolution proceeding; (ii) administrative or regulatory proceeding; or (iii) administrative or regulatory investigation (each a "Subsequent

Related Claim"),

shall be deemed a **Claim** first made during the **Policy Period**.

**C.**   Coverage for any **EEOC Charge**, **Written Demand**, or Subsequent Related Claim described in B above shall only be available if:

**1.**   no **Claim Manager** was aware of such **EEOC Charge** or **Written Demand** prior to theexpiration of the time to give notice of such **Claim** under the **Prior EPL Policy**;

**2.**   no **Related Claim** to such **EEOC Charge** or **Written Demand** that is a: (i) civil lawsuit, arbitration or alternative dispute resolution proceeding; (ii) administrative or regulatory proceeding; or (iii) administrative or regulatory investigation, was commenced prior to the **Policy Period**;

**3.**   such **EEOC Charge** or **Written Demand** would have been covered under the **Prior EPL Policy** had notice of such **Claim** been given under the **Prior EPL Policy**; and

**4.**   written notice is given to the **Insurer** of such **Claim** no later than 60 days after the earlier of: (i) the date that any **Claim Manager** became aware of such **Claim**; or (ii) the end of the **Policy Period.**

**D.**   Coverage for any **EEOC Charge**, **Written Demand**, or Subsequent Related Claim described in B above shall only apply to **Loss** incurred after the earliest date that: (i) any **Claim Manager** became aware of such **EEOC Charge** or **Written Demand**; or (ii) the date the Subsequent Related Claim was commenced.  The maximum coverage available under this Policy for any such **EEOC Charge**, **Written Demand**, or Subsequent Related Claim shall be the lesser of the coverage available under the **Prior EPL Policy** or this Policy taking into account all of the terms, conditions and exclusions of each policy, including, without limitation, the applicable retention or deductible and available limit of liability under each policy as reduced by payments of **Loss**.

**E.**   "**Claim Manager**" means any of the following designated positions (as indicated with an "X") of the **Named Organization**, including any functionally equivalent positions:

- [X]   chief executive officer;

- [X]   chief financial officer;

- [X]   member of the in-house risk management or law departments;

- [X]   director of the human resources department, or

**F.**   "**EEOC Charge**" means any written charge filed by an **Employee**, applicant for employment with any **Insured Organization**, or **Independent Contractor** with the Equal Employment Opportunity Commission or any state or local fair employment practices agency.  **EEOC Charge** excludes any lawsuit, proceeding, or investigation initiated by the Equal Employment Opportunity Commission or any state or local fair employment practices agency.

**G.**   "**Prior EPL Policy**" means the policy immediately preceding this Policy as specified below:

Arch Insurance Company, Policy # PCD9300378-01

**H.**   "**Written Demand**" means any **Claim** that is a written demand or request as described in

Section 2. Definitions, B.1 or 5.

3.   **LOANED EMPLOYEE COVERAGE**

Section 2. Definitions, C. **"Employee"** is deleted and replaced by:

**"Employee"** means any natural person whose labor or service was, is or shall be engaged and directed by any **Insured Organization**, including fulltime, part-time, seasonal, leased, loaned or temporary employees as well as volunteers. **Employee** shall not include any **Independent Contractor**.

4.   **PRIOR INSURANCE NOTICE – SIMILAR POLICIES**

Section 3. Exclusions, A.1 is deleted and replaced by:

arising from, based upon, or attributable to any fact, circumstance or situation that, before the inception date of this Policy, was the subject of any notice given under any other employment practices liability, management liability or similar insurance policy;

5.   **PRIOR & PENDING LITIGATION**

Section 3. Exclusions, A. 2 is deleted and replaced by:

arising from, based upon, or attributable to any:

a.   written demand, suit or proceeding made or initiated against any **Insured** on or prior to the applicable Pending and Prior Litigation Date in Item 6 of the Declarations; or

b.   any **Wrongful Act** alleged in any such demand, suit, proceeding or any **Interrelated Wrongful Acts** thereto.

6.   **POLLUTION EXCLUSION DELETION**

Section 3. Exclusions, A.4 is deleted.

7.   **NEW SUBSIDIARY/MERGER COVERAGE**

Regarding the Employment Practices Liability Coverage Part only, General Provisions Section 14. Corporate Transactions, B, last paragraph is deleted and replaced by:

If the number of employees of a newly merged or acquired entity exceeds 35% of the number of employees of all **Insured Organizations** combined prior to such merger or acquisition, then as a condition precedent to coverage for such new **Insureds**, the **Named Organization** shall give the **Insurer** written notice of the transaction as soon as practicable and shall pay any reasonable additional premium, and shall agree to any additional terms and conditions, required by the **Insurer**. The **Insureds** shall furnish all information regarding such transaction as the **Insurer** shall request.

8.   **WRONGFUL ACT DEFINITION**

Section 2. Definitions K. **"Wrongful Act"** is deleted and replaced by:

**"Wrongful Act"** means:

1.   Regarding Insuring Agreement A, any actual or alleged:

   a.   wrongful dismissal, discharge or termination of employment, including constructive dismissal, discharge, or termination;

   b.   employment discrimination based on age, gender, race, color, national origin, religion, creed, sexual orientation or preference, marital status, gender identity or expression, pregnancy, disability, health status, HIV status, military or veteran status, genetic makeup, political affiliation, or any other protected status specified under federal, state or local law;

   c.   sexual or other workplace harassment, including, without limitation, hostile work environment, bullying, or quid-pro-quo;

   d.   wrongful deprivation of a career opportunity, demotion, failure to employ or promote, discipline of employees, or failure to grant tenure;

   e.   breach of any oral, written, or implied employment contract or agreement including, without limitation, any obligation arising out of any employee manual, handbook, or policy statement;

   f.   **Retaliation**;

   g.   violation of the Family and Medical Leave Act; or

   h.   provided that the following conduct relates to matters described in paragraphs a through g above:

      1.   invasion of privacy;

      2.   infliction of emotional distress or mental anguish;

      3.   employment related defamation, including, without limitation, a negative or defamatory employment reference;

      4.   employment related misrepresentation;

      5.   failure to provide or enforce adequate or consistent corporate employment policies and procedures; or

      6.   negligent hiring, retention, supervision, evaluation or training of **Employees**,

      committed or attempted: (i) against any **Employee**, applicant for employment with any **Insured Organization**, or **Independent Contractor**; and (ii) by any **Insured Person** in their capacity as such or any **Insured Organization**.

2.   Regarding Insuring Agreement B, any actual or alleged discrimination, sexual harassment, or violation of a **Third Party's** civil rights relating to such discrimination or sexual harassment, by any **Insured Persons** in their capacity as such or by any **Insured Organization**.

Without limitation, the conduct described in 1 and 2 above shall include matters carried out by any means in any location, including the Internet (i.e. e-mail, instant messaging, social networking services, blogs, etc.), regardless of whether access to the Internet is effected: (i)

on or off the premises of any **Insured Organization**; or (ii) through any computer or device owned or leased by any **Insured Organization**, **Insured Person**, or others.

**9.   RETALIATION DEFINITION**

Section 2. Definitions, H. **"Retaliation"** is deleted and replaced by:

**"Retaliation"** means any negative treatment of an **Employee** or **Independent Contractor** in response to an **Employee** or **Independent Contractor**:

1.    exercising his or her rights under law, including, without limitation, rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

2.    refusing to violate any law;

3.    assisting, testifying in, or cooperating with, a proceeding or investigation regarding alleged violations of law;

4.    disclosing or threatening to disclose to a superior or to any governmental agency any alleged violations of law; or

5.    filing any claim under the False Claims Act, the Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or any similar law that protects a "whistleblower".

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 14

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## WORKPLACE VIOLENCE COVERAGE
### (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

Regarding the Employment Practices Liability Coverage Part and for the purposes of coverage in this Endorsement only, it is agreed that:

## DECLARATIONS

1. **Aggregate Single Loss Limit of Liability:**          $250,000

2. **Deductible:**                                        $0

## TABLE OF CONTENTS

1. **INSURING AGREEMENT**
2. **DEFINITIONS**
3. **EXCLUSIONS**
4. **LIMIT OF LIABILITY**
5. **PRIOR LOSS COVERAGE**
6. **LOSS REPORTING RIGHTS AND DUTIES**
7. **LOSS COOPERATION**

1. **INSURING AGREEMENT**

   The **Insurer** shall reimburse **Workplace Violence Costs** resulting from any **Workplace Violence** first commenced during the **Policy Period**.

2. **DEFINITIONS**

   Whether used in the singular or plural, the following terms shall have the meanings specified below:

   A. **"Discovery"** means knowledge acquired by an **Executive** that would cause a reasonable person to believe (i) a covered **Loss** has occurred or (ii) that circumstances have arisen that may subsequently result in a covered **Loss**, including **Loss**:

      1. sustained prior to the inception date specified in Item 2 of the Declarations for this Policy; or

      2. for which exact details are unknown.

   B. **"Employee"** means any natural person whose labor or service is engaged and directed by any **Insured Organization**, including any: (i) **Executive**; (ii) fulltime, part-time, seasonal, leased or temporary employee; or (iii) volunteer.   **Employee** shall not include any **Independent Contractor**.

   C. **"Executive"** means any natural person who is a duly elected or appointed:

      1. director, officer, or member of the board of managers or management committee of an **Insured Organization**;

    **2.**    in-house general counsel of an **Insured Organization**; or

    **3.**    manager of an **Insured Organization** organized outside the United States of America if such manager holds a position equivalent to those specified in 1 or 2 above.

**D.**    **"Insured Person"** means any natural person who is:

    **1.**    an **Employee**; or

    **2.**    visiting the **Premises** for a lawful purpose.

**E.**    **"Insured"** means any:

    **1.**    **Insured Organization**; or

    **2.**    **Insured Person**.

**F.**    **"Loss"** means any **Workplace Violence Costs**.

**G.**    **"Premises"** means buildings, facilities or properties occupied by an **Insured Organization** in conducting its business activities.

**H.**    **"Workplace Violence"** means an intentional and unlawful act perpetrated against an **Insured Person** within the **Premises** involving use of a deadly weapon, or threat of such use.

**I.**    **"Workplace Violence Costs"** means the following reasonable costs incurred by an **Insured Organization** in response to any **Workplace Violence**:

    **1.**    security guard services for up to 15 days;

    **2.**    security consulting for up to 90 days;

    **3.**    public-relations consulting for up to 90 days;

    **4.**    a single group counseling for **Employees**; and

    **5.**    forensics analysis.

**3.**    **EXCLUSION**

The **Insurer** shall not be liable to pay **Loss** resulting from any:

**A.**    **Workplace Violence** initiated in connection with a demand for money, securities or other property;

**B.**    declared or undeclared war, civil war, insurrection, rebellion or revolution, military, naval or usurped power, governmental intervention or authority, expropriation or nationalization, or any act or condition incident or related to any of the foregoing; or

**C.**    attorneys fees, expenses, settlements, judgments, penalties or other amounts incurred in defending or prosecuting any legal proceeding or claim involving any **Workplace Violence**.

**4.**    **LIMIT OF LIABILITY**

**A.**     The **Insurer's** maximum liability for each single **Loss** under this Endorsement shall not exceed the Aggregate Single Loss Limit of Liability specified in item 1 of the Declarations of this Endorsement, regardless of the number of **Insureds** incurring such **Loss**.   The Aggregate Single Loss Limit of Liability specified in item 1 of the Declarations of this Endorsement shall be part of, and not in addition to, the Limit of Liability for this **Liability Coverage Part**.

**B.**     All **Loss** arising out of a single incident or related incidents of **Workplace Violence** shall be considered a single **Loss**.

**C.**     If there is more than one **Insured**, the maximum liability of the **Insurer** for any single **Loss** sustained by more than one **Insured** shall not exceed the amount for which the **Insurer** would have been liable if the single **Loss** had been sustained by one **Insured**.

**D.**     The amount that the **Insurer** shall pay for any single **Loss** shall not be cumulative from **Policy Period** to **Policy Period**.

**E.**     Unless specified in the Declarations of this Endorsement, there is no Deductible applicable to any **Loss** covered under this Endorsement.

**5.     PRIOR LOSS COVERAGE**

In addition to **Loss** resulting from any **Workplace Violence** first commenced during the **Policy Period**, coverage shall extend to **Loss** resulting from any **Workplace Violence** first commenced prior to the inception of the **Policy Period** provided that:

**A.**     an **Insured Organization** had substantially identical coverage in effect at the time of the prior **Workplace Violence**, such coverage was continuously maintained until the inception of this coverage, and **Discovery** of such **Loss** occurred after the time allowed for reporting such **Loss** under the prior coverage;

**B.**     if prior coverage was provided by the **Insurer** or any affiliate of the **Insurer**, such prior coverage shall be terminated as of the inception of this coverage; and

**C.**     the **Insurer's** maximum liability for each single **Loss** under this Endorsement shall not exceed the lesser of the applicable limit or sublimit of liability under this Endorsement or the limit or sublimit of liability available under the prior coverage.

**6.     LOSS REPORTING RIGHTS AND DUTIES**

**A.**     Knowledge possessed by any **Insured** or **Discovery** shall be deemed knowledge possessed or **Discovery** by all **Insureds**.

**B.**     Upon **Discovery** and as a condition precedent to coverage, the **Named Organization** shall provide to the **Insurer**:

**1.**     written notice of **Discovery** as soon as practicable, but no later than 60 days after the end of the **Policy Period**; and

**2.**     a sworn proof of **Loss** with full particulars.

**C.**     No **Insured** shall institute legal proceedings against the **Insurer** regarding any **Loss** more than 2 years after **Discovery**.

**7.     LOSS COOPERATION**

The **Insureds** shall cooperate with the **Insurer** regarding the handling and processing of all

covered matters under this Policy.

All other terms and conditions of this Policy remain unchanged.


Endorsement Number: 15

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**EMPLOYEE PRIVACY VIOLATION –
DEFENSE COSTS SUB-LIMIT
(EPL COVERAGE PART)**

Regarding the Employment Practices Liability Coverage Part, it is agreed that:

**1.**   The **Insurer** shall not pay **Loss** for any **Employee Privacy Violation Claim** against an **Insured**.

**2.**   **"Employee Privacy Violation Claim"** means any **Claim** arising from, based upon, or attributable to any actual or alleged **Employee Privacy Violation**, regardless of whether such **Claim** also includes non-**Employee Privacy Violation** allegations.

**3.**   **"Employee Privacy Violation"** means an **Insured Organization's** failure to:

    **A.**   secure a **Record** from unauthorized access; or

    **B.**   provide any legally required notice to an **Employee** whose **Record** was, or may have been, subject to unauthorized access.

**4.**   **"Record"** means an **Employee's** last name together with either a first name or first initial in combination with such **Employee's**:

    **A.**   social security number, driver's license number or other personal identification number (including without limitation, an employee ID number or student ID number);

    **B.**   financial account number (including, without limitation, a bank account number, retirement account number, or healthcare spending account number);

    **C.**   credit, debit or other payment card number; or

    **D.**   individually identifiable health information as defined in the Health Insurance Portability and Accountability Act of 1996 ("HIPPA").

**5.**   General Provisions Section 11. Allocation shall not apply to any **Employee Privacy Violation Claim**.

**6.**   Notwithstanding the above, the **Insurer** shall provide **Defense Costs** for a **Employee Privacy Violation Claim** provided that such coverage shall be subject to the following:

    **A.**   The **Insurer's** maximum liability for all **Defense Costs** shall be a Sublimit of Liability of $250,000.  Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay under this coverage.  Such Sublimit of Liability shall be part of, and not in addition to, the limit of liability applicable to this **Liability Coverage Part**.

    **B.**   It shall be the duty of the **Insureds** to defend any **Employee Privacy Violation Claim**.

    **C.**   The **Insurer** shall not have any duty to defend any **Employee Privacy Violation Claim**, provided that the **Insurer** shall have the right to:

        **1.**   associate with the **Insureds** in the defense of any **Employee Privacy Violation Claim**; and

     **2.**    make any investigation it deems appropriate regarding any **Employee Privacy Violation Claim**.

**D.**    At the written request of the **Insureds**, the **Insurer** shall advance **Defense Costs** excess of the applicable Retention prior to the final disposition of any **Employee Privacy Violation Claim**, provided that the **Insureds** shall repay such **Defense Costs** if it is subsequently determined that such **Defense Costs** are not covered under this Policy.

**E.**    The **Insureds** shall not admit nor incur any **Defense Costs** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld.  The **Insurer** shall not be liable for any **Defense Costs** to which it has not consented.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 16

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND WAGE & HOUR EXCLUSION
## (EPL COVERAGE PART)

Regarding the Employment Practices Liability Coverage Part, it is agreed that:

**1.**   Section 3. Exclusion, A.5 is amended to delete "(ii) the Fair Labor Standards Act (except the Equal Pay Act)".

**2.**   The **Insurer** shall not pay **Loss** that is based upon, arising out of or in any way related to any actual or alleged violation of any **Wage and Hour Laws**, provided that this exclusion shall not apply to **Loss** resulting from **Retaliation**.

**3.**   **"Wage and Hour Laws"** means any federal, state, or local law regulating the payment of compensation to **Executives**, **Employees**, or **Independent Contractors**, including, without limitation: (i)  the Fair Labor Standards Act (except the Equal Pay Act) or any similar law; (ii) laws regulating the payment of overtime, on-call time or minimum wages or the classification of employees for the purpose of determining employees' eligibility for compensation under such laws; and (iii) laws regulating meal and rest periods and the maintenance of accurate time records.

For purposes of this Endorsement only and regarding the General Provisions, it is agreed that:

**1.**   Section 8. Defense of Claims, A. and B. are deleted and replaced by:

    **A.**   It shall be the duty of the **Insureds** to defend any **Claim** that includes any actual or alleged violation of any **Wage and Hour Laws**.  The **Insurer** shall not have any duty to defend any **Claim** that includes any actual or alleged violation of any **Wage and Hour Laws** provided that the **Insurer** shall have the right to associate with the **Insureds** in the defense of and make any investigation it deems appropriate regarding any such **Claim**.

    **B.**   If any applicable Limit is exhausted, the premium for this Policy shall be fully earned.

**2.**   Section 11. Allocation is deleted and replaced by:

If the **Insureds** incur **Loss** that is only partially covered by this Policy because a **Claim** includes both covered and uncovered matters or because a **Claim** is made against both covered and uncovered parties, **Loss** shall be allocated between covered **Loss** and non-covered **Loss** based upon the relative legal exposure of all parties to such matters.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 17

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDMENTS TO FIDUCIARY LIABILITY COVERAGE PART (LOCKTON)**

Regarding the Fiduciary Liability Coverage Part, it is agreed that:

1. **ARBITRATION, MEDIATION AND ADR COVERAGE**

    Section 2. Definitions, B. **"Claim"** is deleted and replaced by:

    B.    **"Claim"** means any:

    1.    written demand or notice for civil monetary damages or other civil non-monetary relief commenced by the **Insured's** receipt of such demand or notice;

    2.    civil proceeding, including but not limited to any arbitration proceeding or other alternative dispute resolution (ADR) proceeding, commenced by the service upon the **Insured** of a complaint, demand for arbitration, or similar pleading;

    3.    criminal proceeding commenced by the return of an indictment, information or similar pleading;

    4.    formal administrative or regulatory proceeding commenced by the filing of a notice of charges or any similar document;

    5.    formal administrative or regulatory governmental investigation (including a fact-finding investigation by the Department of Labor, Pension Benefit Guaranty Corporation or similar authority) of an **Insured** commenced by the service upon or other receipt by such **Insured** of a written notice from an investigating authority identifying such **Insured** as a target against whom a formal proceeding may be commenced;

    6.    written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim** as described in 1 through 5 above, commenced by the **Insured's** receipt of such request; or

    7.    regarding Insuring Agreement B, a **Settlement Program Notice**.

2. **MULTIPLE DAMAGES COVERAGE**

    A.    Section 2. Definitions, G **"Loss"**, second paragraph is deleted and replaced by:

    **Loss** shall include punitive and exemplary damages and the multiple portion of any multiplied damage award where insurable by law.  The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

    B.    Section 2. Definitions, G **"Loss"** is amended to delete item 2 of the third paragraph.

3. **INVESTMENT LOSS COVERAGE**

    Section 2. Definitions, G **"Loss"** is amended to add:

    **"Loss"** shall also include amounts representing a decrease in value of the accounts of a **Sponsored Plan** because of a change in value of the investments held by such **Sponsored Plan**, regardless of whether such amounts have been characterized as "benefits" by counsel prosecuting any **Claim** or any court or tribunal adjudicating any **Claim**.

4.    **PRIOR INSURANCE NOTICE – SIMILAR POLICIES**

Section 3. Exclusions, A.1 is deleted and replaced by:

arising from, based upon, or attributable to any fact, circumstance or situation that, before the inception date of this Policy, was the subject of any notice given under any other fiduciary liability, management liability or similar insurance policy;

5.    **PERSONAL PROFIT EXCLUSION – FINAL ADJUDICATION**

Section 3. Exclusions, A.8 is deleted and replaced by:

arising from, based upon, or attributable to the gaining of any personal profit, remuneration or advantage to which such **Insured** is not legally entitled if a final adjudication in such **Claim** establishes that such profit, remuneration or advantage occurred;

6.    **CONDUCT EXCLUSIONS – IMPUTATION LIMITATIONS**

Section 3. Exclusions, A is amended by replacing the paragraph following exclusion 9 with:

Regarding exclusions 8 and 9 above: (i) no **Wrongful Act** of any **Insured Person** shall be imputed to any other **Insured Person**; and (ii) only a **Wrongful Act** by a past, present or future chief executive officer, chief operating officer or chief financial officer of any **Insured Organization** shall be imputed to an **Insured Organization** or **Plan**.

7.    **WAGE AND HOUR EXCLUSION**

The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured** arising from, based upon, or attributable to any unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, failure to grant meal and rest periods, or social security benefits.

8.    **WAIVER OF RECOURSE**

The **Insurer** shall have no right of recourse against any **Insureds** for any payment of **Loss** made by the **Insurer** under this **Liability Coverage Part** because of a **Wrongful Act** by such **Insureds** if the premium for this Policy was paid for by other than a **Plan**.

9.    **PRIORITY OF PAYMENTS & BANKRUPTCY CLARIFICATION**

A.    In the event of **Loss** arising from one or more **Claim(s)** for which payment is due under the provisions of this Policy, then this Policy shall:

1.    first, pay such **Loss** for which coverage is provided for **Insured Persons**;

2.    second, only if and to the extent the payment for **Insured Persons** does not exhaust the Limit of Liability, then pay such **Loss** for which coverage is provided for **Plans**; and

3.    third, only if and to the extent the payments for **Insured Persons** and **Plans** do not exhaust the Limit of Liability, then pay such **Loss** for which coverage is provided for the **Insured Organization**.

B.    For purposes of this Endorsement, nothing herein shall be construed to increase the Limit of Liability of the **Insurer**.

**C.** The bankruptcy or **Insolvency** of any **Insured** shall not diminish or otherwise affect the **Insurer's** obligation under this Policy.

**10.** <u>**NON-INDEMNIFIABLE LOSS**</u>

Section 1. Insuring Agreements, A. Fiduciary Liability is deleted and replaced by:

**A.** **Fiduciary Liability**

The **Insurer** shall pay both **Non-Indemnifiable Loss** and **Indemnifiable Loss** on behalf of the **Insureds** resulting from a **Claim** first made against the **Insureds** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insureds** or by any person for whose **Wrongful Acts** the **Insureds** are legally responsible.

For purposes of this Endorsement only:

**"Indemnifiable Loss"** means **Loss** incurred by any **Insured Person** for which any **Insured Organization** or any **Plan** has indemnified, or is permitted or required to indemnify, pursuant to law or contract or the charter, bylaws, operating agreement, trust documents or similar documents of the **Insureds** or **Plan**.

**"Non-Indemnifiable Loss"** means any **Loss** incurred by **Insured Persons** that all **Insured Organizations** or **Plans** cannot indemnify because of:

**1.** legal prohibition; or

**2.** **Insolvency**.

In determining **Non-Indemnifiable Loss**, all **Insured Organizations** and **Plans** shall be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted or required by law.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 18

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND DEFINITION OF LOSS – HIPAA SUBLIMIT**
**(FIDUCIARY COVERAGE PART)**

Regarding the Fiduciary Liability Coverage Part, it is agreed that:

Section 2.  DEFINITIONS, G. **"Loss"**, item 1.c. is deleted and replaced by:

**c.**     civil penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, provided that the **Insurer's** maximum aggregate liability for all such civil money penalties under this Policy shall be subject to a sublimit of $100,000 that shall be the maximum aggregate amount that the **Insurer** shall pay for all such penalties and shall be part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**; or

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 19

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CROWN CANOPY
CRIME COVERAGE PART**

Regarding the Crime Coverage Part, it is agreed that:

1.  **CHARGE CARD FORGERY OR ALTERATION INSURING AGREEMENT**

    A.  The **Insurer** shall pay **Loss** by an **Insured** resulting from a **Third Party** committing any **Charge Card Fraud** provided that:

        1.  the terms and conditions imposed by the issuer of any credit, debit or charge card have been complied with; and

        2.  the **Insured** is legally liable for such **Loss**.

    B.  This Insuring Agreement shall be subject to the following limit of liability and deductible:

        Limit of Liability: $1,000,000

        Deductible: $25,000

    C.  **"Charge Card Fraud"** means **Forgery** or **Alteration** of any **Financial Instrument** required in connection with any corporate credit, debit or charge card issued to any:

        1.  **Insured Organization**; or

        2.  **Executive** or **Employee** provided that an **Insured Organization** has requested the issuance of such card to such **Executive** or **Employee**.

2.  **"COMPUTER FRAUD" - OFF-LINE MEDIA COVERAGE**

    Section 2. Definitions, C. **"Computer Fraud"** is amended to add:

        **"Computer Fraud"** includes **Theft** directed solely against an **Insured Organization** through the use of computer or computer network off-line media libraries.

3.  **EXPANDED "EMPLOYEE" DEFINITION**

    Section 2. Definitions, I. **"Employee"** is amended to add:

        **"Employee"** also means any natural person:

        1.  non-compensated officer of an **Insured Organization**;

        2.  former **Employee** or **Executive** while retained by, and consulting for, an **Insured Organization**;

        3.  guest student or intern of an **Insured Organization** while pursuing studies or duties under the guidance or direction of such **Insured Organization**;

        4.  partner or limited liability member of an **Insured Organization** provided that the **Insurer** shall not pay **Loss** caused by any partner or limited liability member unless such **Loss** exceeds the sum of:

    **a.**    any amounts an **Insured Organization** owes the partner or limited liability member; and

    **b.**    the value of such partner's partnership interest or limited liability member's ownership interest as determined by the financial records of the **Insured Organization** on the date of the **Discovery**;

    **5.**    furnished to an **Insured Organization** by a temporary or personnel employment service firm to substitute for a permanent **Employee** provided that:

    **a.**    such **Insured Organization** has the right to direct and control such person's services for the **Insured Organization**; and

    **b.**    no coverage shall be provided for any **Loss** resulting from **Theft** by such person outside the **Premises**;

    **6.**    leased to an **Insured Organization** under a written agreement with a labor leasing firm to perform duties directly related to such **Insured Organization's** business.

## 4.   EXPANDED "MONEY" DEFINITION

Section 2. Definitions, R. **"Money"** is amended to add:

**"Money"** also means any bullion, travelers checks, registered checks, or money orders held for sale to the general public.

## 5.   EXPANDED "SECURITIES" DEFINITION

Section 2. Definitions, X. **"Securities"** is amended to add:

**"Securities"** also means any tokens, tickets, revenue or other stamps in current use and evidences of debt issued in connection with credit, debit or charge card not issued by an **Insured Organization**.

## 6.   COMPUTER RESTORATION COSTS COVERAGE (INSURING AGREEMENTS A, B, & F)

**A.**    The **Insurer** shall pay **Computer Restoration Costs** incurred by any **Insured** resulting from any **Loss** covered under Insuring Agreements A, B, or F provided that such **Loss** exceeds the Deductible applicable to the relevant Insuring Agreement.

**B.**    This coverage shall be subject to a Sublimit of Liability of $100,000 under Insuring Agreements A, B, and F.  Such Sublimit of Liability shall be the maximum aggregate amount that the **Insurer** shall pay for this coverage under each relevant Insuring Agreement.  Such Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to each relevant Insuring Agreement.  Other than as specified above, no Deductible shall apply to this coverage.

**C.**    **"Computer Restoration Costs"** means reasonable and necessary expenses incurred by an **Insured** with the **Insurer's** prior written consent to reproduce or duplicate damaged or destroyed **Data** or computer programs.  If such computer programs cannot be duplicated from other computer programs, then **Computer Restoration Costs** shall also include reasonable costs incurred for computer time, computer programmers, technical experts, and consultants to restore the computer programs to substantially the same level of operational capability immediately preceding the covered loss.  **Computer Restoration Costs** shall not include any compensation, benefit expenses, or overhead of any **Insureds** or any expenses incurred by any **Customer**.

**7.** **PRIOR DISHONESTY EXCLUSION - $25,000 THRESHOLD**

Section 3. Exclusions A. 9.a is deleted and replaced by:

after an **Executive** or **Risk Manager** acquires knowledge of fraud or dishonesty committed by such **Employee** prior to employment with an **Insured** involving **Money**, **Securities** or **Property** valued at $25,000 or more.

**8.** **TERMINATED EMPLOYEE COVERAGE - DISCOVERY UP TO 90 DAYS AFTER TERMINATION**

Section 3. Exclusions A. 9.b is amended to replace "sixty (60) days" with "ninety (90) days".

**9.** **DELETION OF UNIDENTIFIED EMPLOYEE EXCLUSION**

Section 3. Exclusions, B.1 is deleted.

**10.** **CLAIM REPORTING - UP TO 90 DAYS AFTER DISCOVERY**

Section 11. Loss Reporting Rights and Duties, B.1 is amended to replace "thirty (30) days" with "ninety (90) days".

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 20

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND DEFINITIONS OF DATA AND LOSS**

**(CRIME COVERAGE PART)**

Regarding the Crime Coverage Part, it is agreed that:

**1.**    Section 2. Definitions, G. **"Data"** is deleted and replaced by:

> **"Data"** means information of any kind regardless of the medium in which information is stored.  Such medium shall include, without limitation, accounts, microfilms, tapes or other paper or electronic records.  **Data** shall include, without limitation, any financial information, credit card information, or health information.

**2.**    Section 2. Definitions Q. **"Loss"** is deleted and replaced by:

> **"Loss"** means direct loss sustained.  Notwithstanding the foregoing, **Loss** shall include **Investigation Costs** if Investigation Costs Coverage is elected in Item 6 of the Declarations. **Loss** shall not include any expense incurred in response to a security breach involving **Data**, including, without limitation, any notification, identity protection, credit monitoring, public relations, forensic audit or accounting expenses or any other expenses to comply with federal or state laws or Payment Card Industry Data Security Standards.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 21

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND OWNERSHIP OF PROPERTY; INTERESTS COVERED SECTION
(CRIME COVERAGE PART)**

Regarding the Crime Coverage Part, it is agreed that:

Section 6. Ownership of Property, Interests Covered B. is deleted and replaced by:

**B.**     Regarding Insuring Agreement B, coverage shall only apply to **Money**, **Property** or **Securities**: (i) of a **Customer** held by the **Insured Organization**; (ii) of a **Customer** for which the **Insured Organization** is legally liable; (iii) owned by a **Customer**; or (iv) held by a **Customer**, for which such **Customer** is legally liable.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 22

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PRIOR ACTS EXCLUSION**

Regarding the **Liability Coverage Parts**, it is agreed that:

**1.**   "Prior Act Date" means

11/07/2007

**2.**   The **Insurer** shall not pay **Loss** in connection with any **Claim** for, based upon, arising from, or in any way related to any act, error, omission, misstatement, misleading statement, neglect or breach of duty occurring, or alleged to have occurred:

    **A.**   on or before the Prior Act Date; or

    **B.**   after the Prior Act Date if related to any act, error, omission, misstatement, misleading statement, neglect or breach of duty occurring, or alleged to have occurred, on or before the Prior Act Date.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 23

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ADDITIONAL INSURED ORGANIZATIONS WITH PRIOR ACT DATE**
**(GENERAL PROVISIONS)**

Regarding the General Provisions, it is agreed the following applies for each **Liability Coverage Part** purchased:

1.   The definition of **Insured Organization** is amended to add the following entity(ies):
     Dearborn Mid-West Conveyor Co.; DMW Systems, Inc.; DMW Acquisition, LLC

2.   "Prior Act Date" means: 11/7/2007

3.   The **Insurer** shall not pay **Loss** on account of any **Claim** against the entity(ies) specified in 1 above or any **Insureds** of such entity(ies) based upon, arising out of, or attributable to any act, error, omission, misstatement, misleading statement, neglect or breach of duty occurring, or alleged to have occurred:

     **A.**   on or before the Prior Act Date or

     **B.**   after the Prior Act Date if related to any act, error, omission, misstatement, misleading statement, neglect or breach of duty occurring, or alleged to have occurred, on or before the Prior Act Date.

The following shall also apply to the Crime Coverage Part or Kidnap, Ransom and Extortion Coverage Part if purchased:

1.   The definition of **Insured Organization** is amended to add the following entity(ies):
     Dearborn Mid-West Conveyor Co.; DMW Systems, Inc.; DMW Acquisition, LLC

2.   The **Insurer** shall not pay for **Loss** sustained on or prior to 11/7/2007 by the entity(ies) specified in 1 above or any **Insureds** of such entity(ies).

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 24

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**PAYMENT INSTRUCTION FRAUD COVERAGE**
**(CRIME COVERAGE PART)**

Regarding the Crime Coverage Part, it is agreed that:

1.      Item 6 of the Declarations is amended to include:

| Insuring Agreement | Limit of Liability | Deductible |
|---|---|---|
| H.      Payment Instruction Fraud | $250,000 | $50,000 |

2.      Section 1. Insuring Agreements is amended to add:

> **H.      Payment Instruction Fraud**
>
> The **Insurer** shall pay **Loss** by an **Insured** of **Money** or **Securities** resulting from any **Payment Instruction Fraud**.

3.      **"Payment Instruction Fraud"** means a communication from a **Third Party** that: (i) purports to be from a customer, vendor, business affiliate, **Employee**, **Executive**, of an **Insured Organization**, but is actually not from such customer, vendor, business affiliate, **Employee**, or **Executive**; and (ii) requests the transfer, payment or delivery of **Money** or **Securities**.

4.      Regarding all Insuring Agreements other than Insuring Agreements A and H, the **Insurer** shall not be liable to pay **Loss** resulting from **Payment Instruction Fraud**.

5.      Section 3. Exclusions, A.11 shall not apply to Insuring Agreement H.

6.      Regarding Insuring Agreement H, the **Insureds** shall bear uninsured at their own risk 50 percent of such **Loss** excess of the applicable Deductible.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 25

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**SPECIFIC ENTITY EXCLUSION**

Regarding all **Liability Coverage Parts**, it is agreed that the **Insurer** shall not pay **Loss** for any **Claim** against an **Insured**:

**1.**      made against, or brought by or on behalf of, an **Entity**; or

**2.**      alleging, based upon, arising out of, or attributable to any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an **Entity**.

**Entity** means Dearborn Mid-West Company, LLC or any subsidiary of any of such entity, or any past, present or future director, officer, partner, owner, affiliate, member, member of the board of managers or management committee or employee of any of such entities or any person whose labor or service was, is, or shall be engaged or directed by any of such entities.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 26

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**KANSAS AMENDATORY ENDORSEMENT**

It is agreed that:

1.   General Provisions Section 15. Application, A. is deleted and replaced by:

    **A.**   The **Insureds** represent that the information contained in the **Application** is true, accurate and complete.  This Policy is issued in reliance upon the **Application**.  If the **Application** contains misrepresentations or omissions made with intent to deceive or that materially affect the acceptance of the risk or the hazard assumed by the **Insurer**, this Policy shall be cancelled and shall not afford coverage for any **Insured** who knew on the inception date of this Policy the facts that were not truthfully disclosed in the **Application**, whether or not the **Insured** knew the **Application** contained such misrepresentation or omission.

2.   General Provisions Section 21. Cancellation is deleted and replaced by:

CANCELLATION

The **Named Organization** may cancel this Policy at any time by telling the **Insurer** in writing what date the **Named Organization** wants the coverage to end.  If the **Named Organization** cancels this Policy, the **Insurer** shall retain the pro rata earned premium plus 10% of such amount.  Any premium refund due to the **Named Organization** will be refunded to it.

If this Policy has been in effect for less than ninety (90) days, it may be cancelled by the **Insurer** or on its behalf for any reason.  If this Policy has been in effect for ninety (90) days or more, this Policy may only be cancelled by or on behalf of the **Insurer** for one of the following reasons:

    1)   nonpayment of premium;

    2)   the Policy was issued because of a material misrepresentation;

    3)   the **Insureds** violated any of the material terms and conditions of the Policy;

    4)   unfavorable underwriting factors specific to the **Insureds** exist that were not present at the inception of the Policy;

    5)   a determination by the Commissioner that continuation of coverage could place the **Insurer** in a hazardous financial condition or in violation of the laws of the State of Kansas; or

    6)   a determination by the Commissioner that the **Insurer** no longer has adequate reinsurance to meet its needs.

The **Insurer** shall mail or deliver written notice to the **Named Organization** at the address shown in Item 1 of the Declarations stating when, not less than thirty (30) days thereafter, such cancellation shall be effective.  In the case of nonpayment of premium, the **Insurer** may cancel coverage upon ten (10) days notice of cancellation.  The mailing of such notice shall be sufficient notice and the effective date of cancellation shall become the end of the Policy Period.  Delivery of such notice shall be equivalent to mailing.  The notice shall provide a written explanation specifically detailing the reason or reasons for cancellation.  If the **Insurer** cancels the Policy, any refund due to the **Named Organization** will be pro rata.

NONRENEWAL

Should the **Insurer** decide to nonrenew this Policy, then the **Insurer** shall mail or deliver written notice of nonrenewal to the **Named Organization** or the **Named Organization's** agent of record at the principal address shown in Item 1 of the Declarations of this Policy at least sixty (60) days before the end of the **Policy Period**.  Delivery of such notice shall be equivalent to mailing.

**3.**   Fiduciary Liability Coverage Part Section 2. Definitions, G. is deleted and replaced by:

**G.**   **"Loss"** means the amount that the **Insureds** are legally obligated to pay resulting from a **Claim**, including, without limitation, damages, settlements, judgments, pre- and post-judgment interest, and **Defense Costs**.  Regarding Insuring Agreement B, **"Loss"** means **Voluntary Settlements** and **Defense Costs**.

**Loss** shall include punitive and exemplary damages where insurable by law.  The insurability of such damages shall be governed by the laws of any applicable jurisdiction that permits coverage of such damages.

**Loss** shall exclude any:

**1.**   taxes, fines or penalties imposed by law other than any;

**a.**   five percent (5%) or less, or twenty percent (20%) or less, civil penalties imposed under Section 502(i) or (l), respectively, of **ERISA**;

**b.**   civil penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, provided that the **Insurer's** maximum aggregate liability for all such civil money penalties under this Policy shall be subject to a sublimit of $25,000 that shall be the maximum aggregate amount that the **Insurer** shall pay for all such penalties and shall be part of, and not in addition to, the Limit of Liability applicable to this **Liability Coverage Part**; or

**c.**   solely with respect to Insuring Agreement B, **Voluntary Settlements**;

**2.**   multiple portion of any multiplied damage award;

**3.**   matters that are uninsurable under the law pursuant to which this Policy shall be construed;

**4.**   amount for which the **Insureds** are not financially liable or for which the claimants are without legal recourse to the **Insureds**; or

**5.**   non-monetary relief.

**4.**   Crime Coverage Part Section 11. Loss Reporting Rights and Duties, D is deleted and replaced by:

**D.**   No **Insured** shall institute legal proceedings against the **Insurer** regarding any **Loss**:

**1.**   more than five (5) years after **Discovery**; or

**2.**   to recover a judgment or settlement against it or its bank resulting from **Forgery** or **Alteration**, or defense costs as specified in Section 7 Defense Costs Coverage (Forgery or Alteration), more than five (5) years after the date such judgment shall become final or settlement was entered.

All other terms and conditions of this policy remain unchanged.

Endorsement Number: 27

Policy Number: PCD 9300378-02

Named Insured: MID-WEST CONVEYOR CO.

This endorsement is effective on the inception date of this Policy unless otherwise stated herein:

Endorsement Effective Date: December 17, 2015

# TERRORISM COVERAGE DISCLOSURE NOTICE

### TERRORISM COVERAGE PROVIDED UNDER THIS POLICY

The Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Program Reauthorization Act of 2015 (collectively referred to as the "Act") established a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.  An act of terrorism is defined as any act certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism.  The policy's other provisions will still apply to such an act.  Your decision is needed on this question: do you choose to pay the premium for terrorism coverage stated in this offer of coverage, or do you reject the offer of coverage and not pay the premium? You may accept or reject this offer.

If your policy provides commercial property coverage, in certain states, statutes or regulations may require coverage for fire following an act of terrorism.  In those states, if terrorism results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property.  Such coverage for fire applies only to direct loss or damage by fire to Covered Property.  Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to Legal Liability coverage forms or Leasehold Interest coverage forms.

**Your premium will include the additional premium for terrorism as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES
The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  **The federal share equals 85% in 2015, 84% in 2016, 83% in 2017, 82% in 2018, 81% in 2019, and 80% in 2020 of that portion of the amount of such insured losses that exceeds the applicable insurer deductible during Calendar Year 2015 and each Calendar Year thereafter through 2020.**

### DISCLOSURE OF CAP ON ANNUAL LIABILITY
If the aggregate insured terrorism losses of all insurers exceed $100,000,000,000 during any Calendar Year provided in the Act, the Secretary of the Treasury shall not make any payments for any portion of the amount of such losses that exceed $100,000,000,000, and if we have met our insurer deductible, we shall not be liable for the payment of any portion of such losses that exceeds $100,000,000,000.

### DISCLOSURE OF PREMIUM
Your premium for terrorism coverage is: $0.00
This charge/amount is applied to obtain the final premium.)
**You may choose to reject the offer by signing the statement below and returning it to us.  Your policy will be changed to exclude the described coverage.** If you chose to accept this offer, this form does not have to be returned.

### REJECTION STATEMENT

> I hereby decline to purchase coverage for certified acts of terrorism.  I understand that an exclusion of certain terrorism losses will be made part of this policy.

|  | MID-WEST CONVEYOR CO. |
| --- | --- |
| Policyholder/Legal Representative/Applicant's Signature | Named Insured |
|  | Arch Insurance Company |
| Print Name of Policyholder/Legal Representative /Applicant | Insurance Company |
| Date: | Policy Number: PCD 9300378-02 |

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully**.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

EXHIBIT B – Page No. 114